Chad E. Nydegger (USB 9962)
cnydegger@wnlaw.com
Workman Nydegger
60 East South Temple, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 533-9800
Facsimile: (801) 328-1707

Jeffrey J. Mayer (*pro hac vice to be filed*)
Jeffrey.Mayer@akerman.com
Catherine A. Miller (*pro hac vice to be filed*)
Catherine.Miller@akerman.com
Timothy K. Sendek (*pro hac vice to be filed*)
Tim.Sendek@akerman.com
Akerman LLP
71 S. Wacker Drive, 47th Floor
Chicago, Illinois 60606
Telephone: (312) 634-5700
Facsimile: (312) 424-1934

*Attorneys for Plaintiff, DIRTT Environmental Solutions, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| DIRTT ENVIRONMENTAL SOLUTIONS, INC. <br><br> Plaintiff, <br><br> v. <br><br> LANCE HENDERSON, KRISTY HENDERSON, FALKBUILT, LLC, FALKBUILT LTD., and FALK MOUNTAIN STATES, LLC <br><br> Defendants. | **VERIFIED COMPLAINT** <br><br> **Civil Case No:** 1:19-cv-144-DB <br><br> **District Judge** Dee Benson <br><br> **JURY DEMANDED** |

DIRTT Environmental Solutions, Inc. ("DIRTT"), by its undersigned counsel, files this

Complaint against Defendants Falkbuilt, LLC, Falkbuilt Ltd. and Falk Mountain States LLC

(collectively "Falkbuilt"), Lance Henderson and Kristy Henderson. As explained in further detail below, former employees of Plaintiff have taken and used DIRTT confidential information in an attempt to steal customers, opportunities, and business intelligence, with the aim of setting up a competing national business. Among other things:  (1) Defendant Lance Henderson uploaded over 35 gigabytes of DIRTT data, which included confidential and proprietary information, to a personal cloud-based data storage location; (2) multiple former DIRTT employees, who are now working for or on behalf of Falkbuilt, all set up personal Dropbox accounts within a couple weeks, or even a few days, prior to leaving DIRTT's employ; (3) Kristy Henderson, Lance Henderson's wife and an employee of a former DIRTT partner, incorporated Defendant Falk Mountain States one month before Mr. Henderson left DIRTT's employ; and (4) Amanda Buczynski, also a former DIRTT employee, immediately after her departure from DIRTT reached out to DIRTT customers on behalf of Falkbuilt in an effort to compete on ongoing projects and undercut DIRTT's bids by utilizing DIRTT confidential information. In support of its Verified Complaint, DIRTT states as follows:

## BACKGROUND OF THE PARTIES

1.      Plaintiff DIRTT is a Colorado company, with its headquarters and principal place of business in Calgary, Alberta, Canada.

2.      DIRTT is an innovative, technology-driven company that operates in Canada, the United States and other jurisdictions around the world. DIRTT's sales offices in Salt Lake City, Phoenix, New York, Chicago, Calgary, and Toronto are supported by its factories and distribution centers across the United States and Canada.

3.      DIRTT offers products and services for the digital design of component, prefabricated construction to build out interior spaces in buildings. Among many other services,

2

DIRTT offers clients the ability to utilize virtual-reality to design office, healthcare, and other interior spaces using modular components which can be rapidly and affordably assembled in DIRTT's factories and on-site.

4.     DIRTT is an innovator and leader in the prefabricated, interior design and construction market space and has been granted over 300 U.S. and foreign patents for the technology in both its building products themselves and the technology to design and fabricate those products.

5.     DIRTT is an inventive manufacturing company featuring a proprietary software and virtual-reality visualization platform coupled with vertically integrated manufacturing that designs, configures and manufactures prefabricated interior construction solutions used primarily in commercial spaces across a wide range of industries and businesses. DIRTT combines innovative product design with its industry-leading, proprietary ICE Software ("ICE Software" or "ICE"), and technology-driven, lean manufacturing practices and sustainable materials to provide an end-to-end solution for the traditionally inefficient and fragmented interior construction industry. DIRTT creates customized interiors with the aesthetics of conventional construction, but with greater cost and schedule certainty, shorter lead times, greater future flexibility, and better environmental sustainability than conventional construction.

6.     DIRTT offers interior construction solutions throughout the United States and Canada, as well as in select international markets, through a network of independent distribution partners ("Distribution Partners") and an internal sales team. The Distribution Partners use the ICE Software to work with end users to envision and design their spaces. Orders are electronically transmitted through ICE to DIRTT's manufacturing facilities for production,

packing and shipping. DIRTT's Distribution Partners then coordinate the receipt and installations of DIRTT's interior construction solutions at the end users' locations.

7.      ICE generates valuable proprietary information, including cost and margin information, the components of the bill of materials for individual companies, detailed plans and specifications for projects and customer requirements.

8.      Apart from ICE, DIRTT's internal restricted information and communications network contains other sources of valuable information, including prospective and current customer databases that include information on potential projects as well as the status of all pending projects, and a restricted site for individual-approved users to access called "MyDIRTT", which contains confidential technical information.

9.       When logging into ICE, the authorized user is directed to a statement regarding the confidential and proprietary nature of the ICE information, including specifically identifying the confidential nature of any "compilation" of information regarding a project or customer.

10.      In addition to sales and marketing, Distribution Partners provide value throughout the planning, design and installation/construction process. At the pre-construction stage, Distribution Partners provide design assistance services to architects, designers and end clients. Through the installation/construction process, Distribution Partners act as specialty subcontractors to the general contractors and provide installation and other construction services. Post move-in, Distribution Partners provide warranty work, ongoing maintenance and repurposing support. The Distribution Partners operate under Distribution Partner agreements with DIRTT, which outline sales goals and marketing territories and provide the terms and conditions upon which the Distribution Partners market and sell DIRTT products.

11.     DIRTT also operates several "DIRTT Experience Centers" ("DXCs") (previously referred to as "Green Learning Centers"), which are display areas used to showcase DIRTT's products and services. DIRTT generally requires its Distribution Partners to construct and maintain a DXC in their local markets. There are currently over 80 DXCs showcasing DIRTT's products and services across North America, the Middle East and India.

12.     DIRTT's principal place of business is located in Calgary, Alberta, Canada. DIRTT also conducts aspects of its North American business in other cities, including Salt Lake City, Utah, Chicago, Illinois, New York, New York, and Phoenix, Arizona. It operates manufacturing facilities in Calgary, Alberta, Phoenix, Arizona and Savannah, Georgia. It currently has a manufacturing facility under construction near Charlotte, South Carolina.

13.     Mr. Henderson is an individual and a resident of Davis County, Utah.

14.     Mr. Henderson was a DIRTT employee responsible for sales and marketing from at least May 2009 to August 2, 2019 when he departed DIRTT of his own initiative.

15.     Kristy Henderson is an individual and a resident of Davis County, Utah.

16.     Falk Mountain States, LLC is a Utah Limited Liability Company incorporated in July 2019 by Kristy Henderson, with an address and registered agent in Logan, Utah.

17.     Falkbuilt, LLC is a Texas Limited Liability Company incorporated in July 2019. Falkbuilt was established to emulate DIRTT's business model by departed DIRTT employees, including Mr. Henderson and Mogens Smed.

18.     Falkbuilt Ltd. is a Canadian company with offices in Calgary, Alberta, Canada.

19.     Until January 2018, Mr. Smed was the Calgary-based CEO of DIRTT. He subsequently left DIRTT in September 2018. Pursuant to his obligations as a DIRTT employee, including fiduciary obligations, and the executive employment agreement signed by him, Mr.

Smed agreed to, among other things, refrain from competing with DIRTT and refrain from soliciting DIRTT employees for a period of two years. Nevertheless, Mr. Smed has done, and continues to do, exactly what he is not permitted to do, namely, establishing a competing business, and soliciting DIRTT employees to leave DIRTT and join his competing business, Falkbuilt. As can be seen from Falkbuilt's website, (www.falkbuilt.com) (advertising interior component construction for healthcare, commercial and office, and education) Falkbuilt competes in the same general market as DIRTT (www.dirtt.com) (advertising projects in education, healthcare, office space, residential, government, and hospitality). Additionally, Falkbuilt's webpages and designs also mimic DIRTT's appearance. To date, over 50 DIRTT employees have joined Falkbuilt. The breach of Mr. Smed's common law employment obligations and express contractual obligations to DIRTT is the subject of ongoing litigation in Alberta, Canada and will be adjudicated by the Canadian courts. This particular action concerns the theft and improper use of DIRTT's confidential information in the United States.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under the following federal statutes: 18 U.S.C. § 1836, 18 U.S.C. § 1030 and 18 U.S.C. § 2701. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as they are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy. The Court also has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 as there is complete diversity and the amount in controversy exceeds the statutory minimum.

21.     This Court has personal jurisdiction over Mr. Henderson and Mrs. Henderson because they are residents of Davis County, Utah.

22.     This Court has personal jurisdiction over Falk Mountain States, LLC because it is incorporated in Utah.

23.     This Court has personal jurisdiction over Falkbuilt, LLC because Falkbuilt, LLC regularly conducts business in the State of Utah, specifically with Falk Mountain States, Mr. Henderson works for Falkbuilt, LLC or on its behalf in the State of Utah, and Falkbuilt, LLC should have reasonably anticipated being hailed into a Utah court over claims based on the DIRTT confidential information it obtained from Mr. Henderson, a Utah resident.

24.     This Court has personal jurisdiction over Falkbuilt Ltd. because Falkbuilt Ltd. regularly conducts business in the State of Utah, specifically with Falk Mountain States, Mr. Henderson works for Falkbuilt Ltd. or on its behalf in the State of Utah, and Falkbuilt Ltd. should have reasonably anticipated being hailed into a Utah court over claims based on the DIRTT confidential information it obtained from Mr. Henderson, a Utah resident.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the events giving rise to this action occurred in this district, and pursuant to §1391(b)(1) as the Hendersons and Falk Mountain States reside in this district.

## FACTUAL BACKGROUND

26.     Since his difficult departure from DIRTT in September 2018, Mr. Smed and those acting in concert with him, including the newly-formed Falk entities, have engaged in an ongoing attempt to replicate DIRTT's business, products and business model through improper means, including but not limited to utilizing DIRTT confidential information and trade secrets to identify and approach customers and potential customers, utilizing pricing and margin information to undercut DIRTT's quotes, and utilizing DIRTT's patented and trade secret technology to gain an unfair advantage in product offerings.

27.     Despite public statements to the contrary by Mr. Smed that Falkbuilt is not a competitor of DIRTT, DIRTT recently determined, based on a forensic study of electronic information, that Falkbuilt was built upon, and is dependent on, both information and employees obtained from DIRTT. (Exhibit O at ¶¶ 6, 9). In fact, Falkbuilt would likely not be operating today but for the customer contact information, pricing, estimates and other DIRTT confidential information and trade secrets taken by former DIRTT employees, including Mr. Henderson, for use at their new business started by Mr. Smed. Based on information obtained by DIRTT, as well as publicly available information, Falkbuilt is directly competing with DIRTT.

28.     Upon information and belief, Mr. Smed not only actively recruited DIRTT employees to join Falkbuilt, including meeting with certain DIRTT employees in advance of their leaving DIRTT's employ, but also encouraged them to solicit other DIRTT employees to work for Falkbuilt. Additionally, on information and belief, Mr. Smed emboldened those same individuals to take with them DIRTT information that they utilized while in DIRTT's employ, and to misappropriate DIRTT's designs and know-how in order to assist Falkbuilt in quickly getting up-to-speed and operational, and to undercut DIRTT's bids and estimates, with the end goal of ultimately taking DIRTT's customers and projects. It is no coincidence that Falkbuilt is bidding on the same projects as DIRTT and contacting DIRTT's customers and prospective customers. This conduct also entirely undercuts Mr. Smed's public statements that Falkbuilt is not competing with DIRTT.

A.     **The Hendersons' Utah Conspiracy**

29.     DIRTT hired Mr. Henderson as a sales representative. In that capacity, he was entrusted with a variety of significant confidential and proprietary information and trade secrets pertaining to DIRTT's business ("DIRTT Confidential Business Information") and owed DIRTT a fiduciary duty with respect to such DIRTT Confidential Business Information. At the time he

8

was hired, Mr. Henderson agreed in writing to maintain the confidentiality of DIRTT's trade secrets and confidential information.

30.      In a May 21, 2009 agreement, Mr. Henderson agreed to DIRTT's terms and conditions regarding his employment, including that he "would not . . . divulge to any other person whosoever and will use [his] best endeavors to prevent unauthorized publication or disclosure of any trade secret, manufacturing process or confidential information concerning the Company and related companies or the finances of the Company and related companies or any of their respective dealings, transactions or affairs which may come to [his] knowledge during or in the course of [his] employment." (Exhibit A).

31.      On June 25, 2019, Mr. Henderson acknowledged DIRTT's Computer/Data Security Policy (Exhibit B), which states in relevant part that:

> This document is not intended to displace any non-disclosure obligations, but rather to ensure proper data security. Please read the following provisions carefully and thoroughly before signing.
>
> POLICIES / PROCEDURES
>
> 1.      Personnel are prohibited from accessing any computer or network location for which they have not previously received proper authorization, and from altering any data or database other than that which is specifically authorized as required in the performance of his or her job functions.
>
> 2.      Sensitive or confidential data/information may not be stored or referenced via systems or communication channels not controlled by DIRTT. For example, the use of external e-mail systems or data storage systems not hosted by or approved by DIRTT, is not allowed.
>
> 3.      Secure passwords are to be used on all systems as per the DIRTT password policy. These credentials must be unique and must not be used on other external systems or services. Passwords or security codes are not to be disclosed to anyone else; do not allow others to use your IDs and/or passwords. Password(s) must be changed whenever the need exists; such as someone else learning your password, or the password becoming known during problem resolution or day-to-day functions, or when requested by DIRTT I.T.

4.     DIRTT I.T. is to be notified immediately in the event that a company device is lost. (mobile phones, laptops etc).

5.     In the event that a system or process is suspected as not being compliant with this policy, immediately notify your supervisor and/or DIRTT I.T. so they can take appropriate action.

6.     Personnel assigned the ability to work remotely must take extra precautions to ensure that data is appropriately handled.

32.     Mr. Henderson's responsibilities included interfacing with customers, understanding and promoting DIRTT's products, services, and technology, and identifying new potential customers and partners for DIRTT in the southwestern United States. In connection with his job, Mr. Henderson was provided with extensive access to DIRTT Confidential Business Information concerning those markets.

33.     Mr. Henderson was also issued a company laptop with access to DIRTT computer resources, including other networked computers, shared file resources, and other repositories of electronically stored information.

34.     Mr. Henderson was not authorized to access, store, or retrieve DIRTT Confidential Business Information other than using DIRTT computers and resources, and then only for bona fide business purposes for the benefit of DIRTT.

35.     In May 2019, DIRTT's Human Resources department received an administrative garnishment order from the State of Utah for $11.3 million, which DIRTT learned was related to Mr. Henderson's 2003 felony securities fraud convictions. (Exhibit C). Until receipt of the garnishment order, DIRTT's then current management team was unaware of Mr. Henderson's felony convictions.

36.     Mr. Henderson's crimes were quite serious. According to press accounts of his sentencing, he pled guilty to a number of felony counts involving his stealing between $6 million

10

and $8 million from investors in fraudulent business ventures, ultimately serving time in prison based on his convictions. *See* "Swindler Sentenced," KSL.com, 6/21/03 (available at https://www.ksl.com/article/90261/swindler-sentenced, last retrieved 12/11/19).

37.     Press reports of Mr. Henderson's sentencing hearing note that over 64 known victims, many of them senior citizens, lost their life savings and retirement pensions to Mr. Henderson's fraudulent scheme. Mr. Henderson was ordered to repay those funds.

38.     While Mr. Smed was aware of these convictions while acting as DIRTT's CEO, he nonetheless regularly supported Mr. Henderson in his role at DIRTT. In fact, when the local Distribution Partner in Salt Lake City expressed a desire not to work with Mr. Henderson, Mr. Smed arranged for another Distribution Partner in Salt Lake City, Interior Solutions, to work specifically with Mr. Henderson. Importantly, Mr. Henderson's wife, Defendant Kristy Henderson, was, and is, the branch manager of Interior Solutions' Salt Lake City office.

39.     The receipt of the wage garnishment order by DIRTT, of which Mr. Henderson quickly became aware, touched off a series of events for Mr. Henderson and DIRTT.

40.     In 2019, after Mr. Smed's departure but before receipt of the wage garnishment order, DIRTT's senior management were considering Mr. Henderson for a promotion.

41.     Upon learning about Mr. Henderson's prior criminal convictions, current DIRTT management provided Mr. Henderson a number of opportunities to explain his actions and provide his version of events. During that process, his anticipated promotion was placed on hold.

42.     Mr. Henderson apparently determined at that point in time to leave DIRTT and return working for his prior supporter, Mr. Smed, at Falkbuilt and to take valuable DIRTT Confidential Business Information with him.

43.     After DIRTT received the garnishment order and placed Mr. Henderson's promotion on hold, Mr. Henderson commenced or continued a scheme to misappropriate DIRTT's confidential and propriety information and trade secrets by uploading DIRTT Confidential Business Information onto a personal, cloud-based data storage location. There was no legitimate business purpose for this activity.

44.     On information and belief, in or around this same time period, Mr. Henderson either made contact or accelerated plans with Mr. Smed and Falkbuilt to assist them in launching a business in Utah to compete with DIRTT, utilizing DIRTT Confidential Business Information to do so.

45.     The departure of his primary benefactor at DIRTT, Mr. Smed, coupled with the forthcoming garnishment (which would far exceed Mr. Henderson's DIRTT salary for over 100 years), likely accelerated Mr. Henderson's plans to misappropriate information from DIRTT for Mr. Smed's new venture.

46.     Starting on Sunday, June 3, 2019, Mr. Henderson began uploading what would ultimately amount to over 35 gigabytes of data[1] from his DIRTT-issued laptop and account to Google "Google Drive" and/or Apple "iCloud" cloud computing servers.

47.     DIRTT IT staff became aware of the unauthorized access to and exfiltration of information from DIRTT's systems on June 10, 2019.

48.     When confronted by DIRTT, Mr. Henderson admitted to uploading the data but denied any improper motive, and purported to allow his cloud account to be removed of such data by DIRTT.

---

[1] On average, one gigabyte contains 4400 documents, depending on the file type.

49.     Further investigation has revealed that, in addition to uploading DIRTT Confidential Business Information to a cloud server, Mr. Henderson had also likely mirrored DIRTT Confidential Business Information to a personal external hard disk drive, which was not authorized by DIRTT.

50.     To date, the unauthorized hard disk drive remains unaccounted for. DIRTT reasonably believes that Mr. Henderson is in possession of and has access to the unauthorized hard disk drive containing DIRTT Confidential Business Information.

51.     The files wrongfully taken by Mr. Henderson included materials which he would not have a need or reason to access in his day-to-day employment at DIRTT, including design and pricing information and proprietary ICE design files and Standard Factory Net (SFN) price lists for projects which had no connection to his employment at DIRTT.

52.     The files obtained by Mr. Henderson also included hundreds of design, layout, pricing, and other files regarding projects, regions, and customers far outside of Mr. Henderson's responsibilities at DIRTT.

53.     The files represent a laundry list of files that would prove extremely helpful in setting up a competing operation at what would become Falkbuilt, LLC, Falkbuilt Ltd. and Falk Mountain States.

54.     Examples of the files misappropriated by Mr. Henderson include: (a) specific budget proposals for projects; and (b) ICE files and SFN summaries, which could be used against DIRTT in bidding for projects because they contain pricing information, among other valuable data.

55.     In the weeks leading up to his departure, Mr. Henderson began separately affirmatively seeking out information from other DIRTT employees regarding internal company

processes, particularly pricing, testing, and structural calculations processes under the guise of improving his knowledge of DIRTT company practices for DIRTT's benefit. Mr. Henderson did so despite the fact that he already knew at the time that he would be leaving DIRTT and assisting Falkbuilt in creating a competing business in Utah.

56.     Shortly after DIRTT's receipt of the garnishment order, Mr. Henderson indicated that DIRTT should terminate its relationship with Interior Solutions, the company where his wife works. DIRTT then terminated the relationship in a negotiated exit.

57.     In her role at Interior Solutions, Kristy Henderson had access to DIRTT Confidential Business Information.

58.     In entering into a Regional Partner Agreement with DIRTT, Interior Solutions agreed in March 2018 that it would not "copy, use, disclose or transfer" any DIRTT confidential information. (Exhibit D). The confidential information included ICE files, SFN pricing, ICE quotes, and final approved ICEcad files. Interior Solutions also agreed to adhere to the proprietary license with respect to its use of ICE software.

59.     On July 8, 2019, Kristy Henderson, Mr. Henderson's wife, incorporated Falk Mountain States. Kristy Henderson, through her work at Interior Solutions as a DIRTT Regional Partner, possessed significant knowledge about DIRTT's operations.

60.     On information and belief, Falk Mountain States was intended to be, and is an affiliate of Falkbuilt, a direct competitor of DIRTT set up by former DIRTT employees. Falk Mountain States' filings with the State of Utah indicate that Falk Mountain States is doing business as "Falkbuilt, Salt Lake City" and "Falkbuilt, St. George".

61.     Mr. Henderson resigned from DIRTT effective August 2, 2019 on several weeks' notice.

62.     Although Kristy Henderson had already formed Falk Mountain States at the time of his resignation, Mr. Henderson told DIRTT that he was leaving to launch a construction company with his wife, Kristy Henderson, and to develop some commercial property that had "been in the works" for 15 years. Mr. Henderson never informed anyone at DIRTT that he was actually going to work for Mr. Smed at Falkbuilt, but instead intentionally misled DIRTT regarding his plan to begin working for a direct competitor.

63.     On August 8, 2019, Mr. Henderson contacted at least one prospective customer of DIRTT "announcing" his and other former DIRTT employees' departures to launch a new competitor to DIRTT. Mr. Henderson's email asked the prospective customer to allow the new entity to bid on an existing project with which he was familiar based on his employment with DIRTT.

64.     While still employed by DIRTT, in direct violation of his fiduciary duties owed to DIRTT, Mr. Henderson conspired with Kristy Henderson and Falk Mountain States to obtain and misappropriate DIRTT Confidential Business Information, including trade secrets, to benefit himself, Kristy Henderson, Falkbuilt and Falk Mountain States.

**B.      Other Efforts to Misappropriate DIRTT Confidential Business Information**

65.     The Hendersons are not the only individuals engaged by Mr. Smed and Falkbuilt to gain access to DIRTT Confidential Business Information.

66.     Amanda Buczynski was a DIRTT employee from October 17, 2016 to September 17, 2019. Ms. Buczynski was responsible for DIRTT sales in a territory that included Western Pennsylvania and West Virginia. She maintained an office on site at a DIRTT partner's facility in Pittsburgh, Pennsylvania.

67.     As part of her job responsibilities with DIRTT, Ms. Buczynski had access to proprietary databases of customer relationships, pricing, costing, and forecasts accessible only to herself, the CEO, and the COO of DIRTT's regional partner.

68.     Ms. Buczynski, as part of her employment with DIRTT, agreed to a confidentiality agreement which provided, among other things, that she would not "without the prior written consent of DIRTT, either during the period of [her] employment or at any time thereafter, disclose or cause to be disclosed any of the Confidential Information in any manner …" (Exhibit E).

69.     Ms. Buczynski also agreed to confidentiality provisions in the DIRTT offer letter she executed on September 30, 2016.

70.     Ms. Buczynski resigned from DIRTT effective September 17, 2019, as with Mr. Henderson, falsely stating to her colleagues that she was not leaving to work for Falkbuilt.

71.     On Ms. Buczynski's last day, she plugged a USB device with a serial number that included 4A3BCF57-0 into her DIRTT-provided laptop. She also accessed a number of files and folders on her work computer's hard drive related to ongoing DIRTT projects. Ms. Buczynski did not possess authorization to undertake any of these acts. (Exhibit F; Exhibit O at ¶ 9).

72.     On August 30, 2019, prior to her departure from DIRTT, Ms. Buczynski copied over 40 files, including one identified as "PPT 'Large Clients'" to a Dropbox directory/folder. (Exhibit G).

73.     In fact, Ms. Buczynski started working on behalf of Falkbuilt immediately following her departure from DIRTT.

74.     Immediately after her departure from DIRTT, Ms. Buczynski reached out to one or more DIRTT customers on behalf of Falkbuilt in an effort to compete on ongoing projects and

to underbid DIRTT by utilizing DIRTT's Confidential Business Information and information obtained from DIRTT's partner. (Exhibit H).

75.    On information and belief, Ms. Buczynski also worked to advance Falkbuilt's interests to the detriment of DIRTT by either hiding or sitting on leads that she received in the time leading up to her departure, including inquiries from potential partners interested in working with DIRTT.

76.    Ms. Buczynski has referred to Falkbuilt as the "new DIRTT" in communications with potential customers, contradicting Falkbuilt's public representations that Falkbuilt is not competing with DIRTT or building upon DIRTT technology and information.

77.    After submitting her resignation to DIRTT, Ms. Buczynski also emailed to her personal email account DIRTT customer contact information, and DIRTT pricing and estimates. (Exhibit I).

78.    Ms. Buczynski's and Mr. Henderson's conduct is part of a pattern of a larger number of former DIRTT employees solicited by Falkbuilt (*see* Exhibit O at ¶ 9):

(a)    On December 28, 2018, Christina Engelbert, while a DIRTT employee, received an email from Dropbox instructing her to "Complete your Dropbox setup." The email indicated that Ms. Engelbert had created a Dropbox account. Ms. Engelbert left DIRTT on December 31, 2018 and subsequently went to work for Falkbuilt. (Exhibit J).

(b)    On December 29, 2018 Clayton Smed, while a DIRTT employee, received an email from Dropbox instructing him to "Complete your Dropbox setup." The email indicated that Mr. Smed had created a Dropbox account. Clayton Smed changed the email associated with his Dropbox account from his DIRTT email to his personal email

on January 14, 2019. Clayton Smed left DIRTT on January 31, 2019 and subsequently went to work for Falkbuilt. (Exhibit K).

> (c)   On January 12, 2019 Laura Shadow, while a DIRTT employee, received an email from Dropbox instructing her to "Complete your Dropbox setup." The email indicated Ms. Shadow had created a Dropbox account. Ms. Shadow left DIRTT's employ on January 31, 2019 and subsequently went to work for Falkbuilt. (Exhibit L).

79.   On September 19, 2018, David Weeks sent Mogens Smed a sensitive, confidential DIRTT document titled "Typical Headwall Cost Breakdown". This information constitutes DIRTT Confidential Business Information. Mr. Weeks left DIRTT on Feb. 28, 2019 and went to work for Mr. Smed at Falkbuilt. (Exhibit M).

80.   Ingrid Schoning (who left DIRTT on September 15, 2019) forwarded a DIRTT confidential document to her Gmail account. This information constitutes DIRTT Confidential Business Information. Ms. Schoning now works for Falkbuilt. Ms. Schoning also changed a Dropbox account to associate it with her personal email address on July 23, 2019. (Exhibit N).

81.   Defendants are using and have misappropriated DIRTT Confidential Business Information and DIRTT has reason to believe that Defendants' actions are ongoing and widespread and directed by Falkbuilt.

82.   DIRTT seeks all relief available at law and in equity including, but not limited to, preliminary and permanent injunctive relief to restrain Defendants from using or disclosing DIRTT Confidential Business Information. DIRTT requests injunctive relief to protect itself from irreparable injuries caused by Defendants' conduct and to prevent further harm. DIRTT also seeks an award of compensatory damages, exemplary damages, and attorney's fees.

83.     DIRTT also seeks expedited discovery. Mr. Henderson and Ms. Buczynski made affirmative efforts to conceal the extent of their actions and DIRTT requires court process to determine the full scope of their wrongdoing, and of misappropriation and use of DIRTT Confidential Business Information by other former DIRTT employees currently employed by or working on behalf of Falkbuilt. Falkbuilt has made public and misleading statements about the nature of its business and has attempted to impede the investigation into its activities. DIRTT's investigation into misappropriated information is ongoing and incomplete, and has been necessarily frustrated by misrepresentations made by Mr. Henderson, Ms. Buczynski, and Falkbuilt as to the nature, scope and use of misappropriated material.

## C.     DIRTT Confidential Business Information Constitutes Trade Secrets

84.     DIRTT's manufacturing approach is built on a foundation of technology, the center of which is the proprietary ICE Software. DIRTT uses ICE Software to design, visualize, configure, price, communicate, engineer, specify, order and manage projects. The ICE Software was developed in or around 2005 as a custom interior design and construction software solution to integrate into DIRTT's offerings. The ICE Software makes manufactured, fully custom interiors both feasible and profitable while addressing challenges associated with traditional construction, including cost overruns, inconsistent quality, delays and significant material waste. The ICE Software is used throughout the sales process, ensuring consistency across DIRTT's services and products received by all of DIRTT's clients.

85.     DIRTT begins manufacturing custom DIRTT products once a file (an "ICE File") is generated and a purchase order is received. The ICE Software allows an entire project to be tracked and managed across the entire production cycle through design, sales, production, delivery and installation. The ICE File (containing a project's engineering and manufacturing

19

data) generated during the design and specification process can be used for optimizing future reconfigurations, renovations, technology integration initiatives and changes to a client's space.

86.     The ICE Software is licensed to unrelated companies and Distribution Partners of DIRTT, but only for certain limited information and only if the parties agree to be bound by a confidentiality agreement.

87.     DIRTT's proprietary ICE Software is among a body of DIRTT's valuable intellectual property. The ICE Software is subject to a number of patents in Canada, the United States, Europe and Singapore. DIRTT also has a number of trademark and copyright protections.

88.     ICE files generated by ICE software contain proprietary costing information that would be of substantial benefit to a competitor seeking to undercut DIRTT on price. Costing is a closely-guarded secret at DIRTT for this reason, and because of the substantial efforts utilized to generate it.

89.     In addition to the ICE Software, during their employment with DIRTT, Mr. Henderson and Ms. Buczynski had access to DIRTT Confidential Business Information, including but not limited to:

(a)     DIRTT's job costing;

(b)     DIRTT's customer, supplier and Distribution Partner contacts and list of prospects and projects;

(c)     DIRTT's sales figures and projections;

(d)     DIRTT's customer presentations and marketing materials;

(e)     DIRTT's marketing and sales strategies;

(f)     DIRTT's customer, supplier and Distribution Partner order histories, needs, and preferences;

(g)     DIRTT's customer proposals, service agreements, contracts and purchase orders;

(h)      DIRTT's plans to expand and target new clients and markets;

(i)      design specifications and drawings of DIRTT products;

(j)      specialized methods and processes used to create custom prefabricated modular interior wall partitions, other ocular interior components and other DIRTT products;

(k)      research and development of new DIRTT products;

(l)      trade secrets and intellectual property strategy, including the ICE Software and ancillary programs;

(m)      strategic plans and business plans; and

(n)      such further and other confidential and proprietary information as may be proven at trial.

This information comprises DIRTT Confidential Business Information.

90.      DIRTT devotes significant resources to developing DIRTT Confidential Business Information.

91.      DIRTT Confidential Business Information constitutes trade secrets of DIRTT. It is vital to DIRTT's business success and enables it to compete effectively in an extremely competitive marketplace. DIRTT takes reasonable measures to protect and maintain the confidentiality of DIRTT Confidential Business Information, including the measures described above.

92.      DIRTT derives substantial economic value from maintaining the secrecy of its DIRTT Confidential Business Information, including, among other things, its pricing, its customer, prospect and supplier information, its sales figures and projections, its marketing and sales strategies, its technical-know-how, its design specifications, and its strategic and business plans. Any of this information would be immensely valuable to a competitor, and a global theft of the information would allow a competitor to bid against DIRTT on projects. DIRTT has

incurred significant costs and expenses developing its DIRTT Confidential Business Information.

93.    DIRTT Confidential Business Information, including, among other things, pricing, its customer, prospect and supplier information, its sales figures and projections, its marketing and sales strategies, its design specifications, and strategic and business plans, is neither generally known, nor is it readily ascertainable, to the general public, to DIRTT's competitors, or to any other person or entity that could obtain value from such information.

94.    DIRTT takes reasonable measures to protect and maintain the secrecy of its DIRTT Confidential Business Information, including, among other things, its pricing, its customer, prospect and supplier information, its sales figures and projections, its marketing and sales strategies, its design specifications, and its strategic and business plans.

95.    DIRTT limits access to DIRTT Confidential Business Information, and requires network passwords to access DIRTT Confidential Business Information on DIRTT's computers, confidential agreements, warranty on ICE Software, and partner confidentiality agreements. DIRTT also has policies and procedures in place governing the access to and use of DIRTT Confidential Business Information, including efforts described above to identify attempts to improperly transfer DIRTT Confidential Business Information.

### COUNT I - VIOLATION OF UTAH UNIFORM TRADE SECRETS ACT
### (Utah. Code § 13-24-1 *et seq.*)(Against All Defendants)

96.    The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

97.    The Utah Uniform Trade Secrets Act ("UTSA") provides a private right of action for misappropriation of trade secrets.

98.     A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Utah. Code § 13-24-2.

99.     The term "misappropriation" includes "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Utah. Code § 13-24-2.

100.    The term "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Utah. Code § 13-24-2.

101.    While a DIRTT employee, Mr. Henderson had access to DIRTT's trade secrets, including confidential customer and account information, such as marketing strategies and techniques, marketing and development plans for client contact information, price lists, specific

contract pricing and payment histories. Such information gives DIRTT a commercial competitive advantage and derives economic value from not being generally known to and not readily ascertainable by the public or any person who can obtain economic value from its disclosure or use.

102.    As a DIRTT employee, Mr. Henderson was aware of the confidential nature of DIRTT's trade secrets and agreed to ensure the continued confidentiality of such information as set forth above.

103.    As a DIRTT employee, Mr. Henderson was also aware that DIRTT placed confidence in him to maintain the confidentiality of DIRTT's trade secrets at least through the confidentiality agreement he signed.

104.    At all relevant times, DIRTT made, and continues to make, reasonable efforts to maintain the secrecy of DIRTT's trade secrets, by, among other things, requiring Mr. Henderson to sign a confidentiality agreement in connection with his employment.

105.    In violation of his duty to refrain from using or disclosing DIRTT's trade secrets, Mr. Henderson, on his own and as part of a conspiracy with all other Defendants, misappropriated DIRTT's trade secrets, including but not limited to, confidential and proprietary customer account information, marketing data and analysis, customer histories and payment histories, including marketing information and hundreds of DIRTT files and folders.

106.    Defendants' violations of the Utah Uniform Trade Secrets Act caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Defendants' misappropriation of DIRTT's trade secrets.

107.    DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT Confidential Business Information and other confidential and proprietary information, and diminishment of business value and competitive standing.

108.    In addition to Mr. Henderson, Falkbuilt, LLC, Falkbuilt Ltd., Falk Mountain States, and Kristy Henderson are directly liable for violations of the Utah Uniform Trade Secrets Act because they actively participated, through their conspiracy with each other and Mr. Henderson, in misappropriating DIRTT's trade secrets.

109.    Falkbuilt, LLC, Falkbuilt Ltd. and Falk Mountain States are also directly liable for violations of the Utah Uniform Trade Secrets Act because they acquired DIRTT trade secret information through its agents, Mr. Henderson and Kristy Henderson, knowing that such information was obtained by improper means, including violations of Mr. Henderson's explicit and implied duties of confidentiality.

110.    Falkbuilt, LLC, Falkbuilt Ltd., Falk Mountain States, Mr. Henderson, and Kristy Henderson are each liable for violations of the Utah Uniform Trade Secrets Act because they used DIRTT trade secrets (which include DIRTT Confidential Business Information) without express or implied permission from DIRTT, and Falkbuilt, LLC, Falkbuilt Ltd., Falk Mountain States, and Kristy Henderson knew or had reason to know that Mr. Henderson had acquired DIRTT's trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use; and had divulged DIRTT's trade secrets when he owed a duty to DIRTT to maintain their secrecy or limit their use.

111.    DIRTT has been and continues to be injured irreparably by Defendants' misappropriations of its trade secrets.

**COUNT II – FEDERAL DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)**
**(Against All Defendants)**

112.    The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

113.    The Federal Defend Trade Secrets Act provides a private right of action for an "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

114.    A "trade secret" means:

> all forms and types of financial, business, scientific, technical, economic or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1836(3).

115.    The term "misappropriation" includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(III).

116.    The term "improper" includes "breach of a duty to maintain secrecy . . ." 18 U.S.C. §1939(6).

117.    DIRTT Confidential Business Information is a "trade secret" under the Federal Defend Trade Secrets Act because it comprises confidential and proprietary customer

26

information, including marketing plans, strategies and data, artwork, financial information, customer information, account histories and other information which DIRTT takes reasonable measures to maintain secret.

118.    Such information derives independent economic value because it provides DIRTT with a commercial competitive advantage from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

119.    The DIRTT trade secrets misappropriated by Defendants are used in interstate commerce to bid for, design, and construct projects throughout the United States.

120.    As a DIRTT employee, Mr. Henderson had contractual and fiduciary duties to maintain the secrecy of DIRTT's trade secrets and not misappropriate the information for his own use or for the use of DIRTT's competitors.

121.    At all relevant times, Mr. Henderson was aware of the duty to maintain the secrecy of DIRTT's trade secrets and not misappropriate such information for his own use or for the use of DIRTT's competitors.

122.    In violation of this duty, Mr. Henderson misappropriated DIRTT's trade secrets, marketing data and analyses, customer histories and payment histories, by taking such information without DIRTT's express or implied consent.

123.    Defendants' violations of the Federal Defend Trade Secrets Act caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Defendants' misappropriation of DIRTT's trade secrets.

124.     DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT's trade secrets, and diminishment of business value and competitive standing.

125.     In addition to Mr. Henderson, Falkbuilt, LLC, Falkbuilt Ltd., Falk Mountain States, and Kristy Henderson are directly liable for violations of the Defend Trade Secrets Act because they actively participated, through their conspiracy with other Defendants in misappropriating DIRTT's trade secrets.

126.     Falkbuilt, LLC, Falkbuilt Ltd. and Falk Mountain States are also directly liable for violations of the Defend Trade Secrets Act because they acquired DIRTT trade secret information through its agents, the Hendersons, knowing that such information was obtained by improper means, including violations of Mr. Henderson's explicit and implied duties of confidentiality.

127.     Falkbuilt, LLC, Falkbuilt Ltd., Falk Mountain States, Mr. Henderson, and Kristy Henderson are liable for violations of the Defend Trade Secrets Act because they used DIRTT trade secrets without express or implied permission from DIRTT and Falkbuilt, LLC, Falkbuilt Ltd., Falk Mountain States, and Kristy Henderson knew or had reason to know that Mr. Henderson had acquired the DIRTT trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use; and had divulged DIRTT trade secrets when he owed a duty to DIRTT to maintain their secrecy or limit their use.

## COUNT III – BREACHES OF CONTRACTS
### (Against Mr. Henderson)

128.     The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

129.     Mr. Henderson owed contractual duties to DIRTT based on his May 21, 2009 agreement to DIRTT's terms and conditions, and his June 25, 2019 execution of DIRTT's Computer/Data Security policy.

130.     On information and belief, Mr. Henderson breached his obligations under the May 21, 2009 agreement by failing to prevent unauthorized publication and disclosure of (a) any trade secret, manufacturing process or confidential information concerning DIRTT, and (b) the finances of DIRTT and respective dealings, transactions or affairs of which Mr. Henderson was familiar during his employment.

131.     For example, Mr. Henderson has used his knowledge of DIRTT dealings with customers and prospective customers for the benefit of Falkbuilt and himself.

132.     On information and belief, Mr. Henderson has also damaged DIRTT by publishing and disclosing to Falkbuilt, DIRTT's competitor, DIRTT Confidential Business Information, including confidential electronic information, copied from DIRTT's computers and systems before his departure.

133.     On information and belief, Mr. Henderson breached his obligations under the June 25, 2019 DIRTT Computer/Data Security Policy by (a) storing information on systems and channels not controlled by DIRTT (e.g., cloud computing services and a personal hard drive), and (b) accessing DIRTT computer or network locations and resources for which he was not previously authorized (e.g. projects outside of his market area, which on information and belief were accessed to benefit Falkbuilt).

**COUNT IV – VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT (12 P.S. § 5302) (Against Falkbuilt, LLC and Falkbuilt Ltd.)**

134.     The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

135.    The Pennsylvania Uniform Trade Secrets Act ("PUTSA") provides a private right of action for misappropriation of trade secrets.

136.    A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 P.S. § 5302.

137.    The term "misappropriation" includes "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." 12 P.S. § 5302.

138.    The term "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."   12 P.S. § 5302.

51000139;5

139.    While a DIRTT employee, Ms. Buczynski, working from Pennsylvania at the time, had access to DIRTT's trade secrets, including DIRTT Confidential Business Information, including confidential customer and account information, such as marketing strategies and techniques, marketing and development plans for client contact information, price lists, specific contract pricing and payment histories. Such information derives economic value because it gives DIRTT a commercial competitive advantage from not being generally known to and not readily ascertainable by the public or any person who can obtain economic value from its disclosure or use.

140.    As a DIRTT employee, Ms. Buczynski was aware of the confidential nature of DIRTT's trade secrets and agreed to ensure the continued confidentiality of such information.

141.    As a DIRTT employee, Ms. Buczynski was also aware that DIRTT placed confidence in her to maintain the confidentiality of DIRTT's trade secrets.

142.    At all relevant times, DIRTT made, and continues to make, reasonable efforts to maintain the secrecy of DIRTT Confidential Business Information, by, among other things, requiring Ms. Buczynski to sign a confidentiality agreement.

143.    In violation of her duty to refrain from using or disclosing DIRTT's trade secrets, Ms. Buczynski, on her own and as part of a conspiracy with Falkbuilt, misappropriated DIRTT's trade secrets.

144.    Falkbuilt, LLC's and Falkbuilt Ltd.'s violations of the Pennsylvania Uniform Trade Secrets Act caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Falkbuilt's misappropriation of DIRTT Confidential Business Information.

31

145.    DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT Confidential Business Information and other confidential and proprietary information, and diminishment of business value and competitive standing.

146.    Falkbuilt, LLC and Falkbuilt Ltd. are directly liable for violations of the Pennsylvania Uniform Trade Secrets Act because they actively participated with Ms. Buczynski in misappropriating DIRTT's trade secrets.

147.    Falkbuilt, LLC and Falkbuilt Ltd. are also directly liable for violations of the Pennsylvania Uniform Trade Secrets Act because they acquired DIRTT trade secret information through its agent, Ms. Buczynski, knowing that such information was obtained by improper means, including violations of Ms. Buczynski's explicit and implied duties of confidentiality.

148.    Falkbuilt, LLC and Falkbuilt Ltd. are liable for violations of the Pennsylvania Uniform Trade Secrets Act because they used DIRTT trade secrets without express or implied permission from DIRTT and Falkbuilt, LLC and Falkbuilt Ltd. knew or had reason to know that Ms. Buczynski had acquired the DIRTT trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use; and had divulged DIRTT's trade secrets when she owed a duty to DIRTT to maintain their secrecy or limit their use.

149.    DIRTT has been and continues to be injured irreparably by Falkbuilt, LLC's and Falkbuilt Ltd.'s misappropriations of DIRTT's trade secrets.

### **PRAYER FOR RELIEF**

WHEREFORE, DIRTT respectfully requests the following relief against Defendants:

a.    Enter judgment for it and against all Defendants on Counts I and II, against Mr. Henderson on Count III, and against Falkbuilt, LLC and Falkbuilt Ltd. on Count IV;

b.    Enter a preservation order preventing the destruction of documents, an order that is necessary in light of the repeated taking and secretive access;

c.   Enter preliminary and permanent injunctions restraining and enjoining each Defendant, and all persons and entities in active concert with any of them, from disclosing, using or misappropriating any of DIRTT's trade secrets;

d.   Enter a mandatory injunction requiring each Defendant, and all persons and entities in active concert with any of them, to return to DIRTT any and all written materials, including copies thereof, and/or flash drives, thumb drives, external hard drives, USB storage drives, computer disks, diskettes, databases and/or other retrievable data which reflect, refer, or relate to DIRTT Confidential Business Information, and any copies that are in Defendants' possession, custody, or control;

e.   Order each Defendant, and all persons and entities in active concert with any of them, to provide a full accounting as to the whereabouts of all of DIRTT's trade secrets, DIRTT Confidential Business Information and other DIRTT property in their possession, custody, or control (including information on the personal cloud drives of Defendants' employees);

f.   Enter judgment that Defendants are jointly and severally liable to DIRTT for its actual damages for losses resulting from Defendants' misappropriation of DIRTT's trade secrets, including but not limited to lost profits proximately caused by Defendants' misappropriation, or in the alternative, a reasonable royalty for Defendants' misappropriation of DIRTT's trade secrets in violation of the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act;

g.   Enter judgment that Defendants are jointly and severally liable to DIRTT for disgorgement of all compensation paid to Mr. Henderson by DIRTT during and after his breaches, and disgorgement of any and all profits Defendants earned as a result of the misappropriation of DIRTT's trade secrets in violation of the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act;

h.   Enter judgment that Defendants are jointly and severally liable to DIRTT for exemplary damages for Defendants' willful, wanton or reckless disregard of DIRTT's rights under the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act;

i.   Enter judgment that Defendants are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for Defendants' willful, wanton or reckless disregard of DIRTT's rights under the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act;

j.   Enter judgment that Falkbuilt, LLC and Falkbuilt Ltd. are jointly and severally liable to DIRTT for its actual damages for losses resulting from their misappropriation of DIRTT's trade secrets, including lost profits proximately caused by Falkbuilt, LLC's and Falkbuilt Ltd.'s misappropriation of DIRTT's trade secrets, or, in the alternative, a reasonable royalty for their misappropriation

33

of DIRTT's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act;

k.  Enter judgment that Falkbuilt, LLC and Falkbuilt Ltd. are jointly and severally liable to DIRTT for disgorgement of all compensation paid to Ms. Buczynski by DIRTT during and after her breaches, and disgorgement of any and all profits Falkbuilt, LLC and Falkbuilt Ltd. earned as a result of the misappropriation of DIRTT's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act;

l.  Enter judgment that Falkbuilt, LLC and Falkbuilt Ltd. are jointly and severally liable to DIRTT for exemplary damages for their willful, wanton or reckless disregard of DIRTT's rights under the Pennsylvania Uniform Trade Secrets Act;

m.  Enter judgment that Falkbuilt, LLC and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for their willful, wanton or reckless disregard of DIRTT's rights under the Pennsylvania Uniform Trade Secrets Act;

n.  Enter judgment that Mr. Henderson is liable to DIRTT for its actual damages and losses resulting from Mr. Henderson's breaches of contracts; and

o.  Award such other and further relief that this Court determines to be just and proper under the circumstances.

Dated: December 11, 2019                DIRTT ENVIRONMENTAL SOLUTIONS, INC.
                                        Plaintiff,


                                        By: /s/ *Chad E. Nydegger*_____
                                            One of Its Attorneys

Chad E. Nydegger
Workman Nydegger
60 East South Temple, Suite 1000
Salt Lake City, Utah 84111
cnydegger@wnlaw.com

Jeffrey J. Mayer
Catherine A. Miller
Timothy K. Sendek
Akerman LLP
71 S. Wacker Drive, 47th Floor
Chicago, Illinois 60606
Jeffrey.Mayer@akerman.com
Catherine.Miller@akerman.com
Tim.Sendek@akerman.com

*Attorneys for Plaintiff*