Chad E. Nydegger (USB 9962)
cnydegger@wnlaw.com
Workman Nydegger
60 East South Temple, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 533-9800

Jeffrey J. Mayer (admitted *pro hac vice*)
Jeffrey.Mayer@akerman.com
Catherine A. Miller (admitted *pro hac vice*)
Catherine.Miller@akerman.com
Akerman LLP
71 S. Wacker Drive, 47th Floor
Chicago, Illinois 60606
Telephone: (312) 634-5700
*Attorneys for Plaintiff, DIRTT Environmental Solutions, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| DIRTT ENVIRONMENTAL SOLUTIONS, INC.; DIRTT ENVIRONMENTAL SOLUTIONS LIMITED<br><br>Plaintiffs,<br><br>v.<br><br>LANCE HENDERSON, KRISTY HENDERSON, FALKBUILT, INC., FALKBUILT LTD., MOGENS SMED, and FALK MOUNTAIN STATES, LLC<br><br>Defendants. | **Case No:** 1:19CV00144-DBB-DPP<br><br>**FIRST AMENDED COMPLAINT**<br><br>**The Hon. David B. Barlow**<br><br>**Magistrate Judge Dustin B. Pead**<br><br>**JURY DEMANDED** |

DIRTT Environmental Solutions, Inc. ("DIRTT Inc.") and DIRTT Environmental Solutions, Ltd. ("DIRTT, Ltd.") (collectively "DIRTT"), by their undersigned counsel, file this First Amended Complaint against Defendants Falkbuilt, Inc. and Falkbuilt Ltd. (collectively "Falkbuilt"), Falk Mountain States, LLC, Mogens Smed, Lance Henderson and Kristy Henderson. Former employees of Plaintiffs have taken and used DIRTT confidential information in an attempt to steal customers, opportunities, and business intelligence, with the aim of setting up a competing national business.

Among other matters:  (1) Defendant Lance Henderson uploaded over 35 gigabytes of DIRTT data, which included confidential and proprietary information, to a personal cloud-based data storage location; (2) multiple former DIRTT employees, who are now working for or on behalf of Falkbuilt, all set up personal Dropbox accounts within a couple of weeks, or even a few days, prior to leaving DIRTT's employ; (3) Kristy Henderson, Lance Henderson's wife and an employee of a former DIRTT partner, incorporated Defendant Falk Mountain States one month before Mr. Henderson left DIRTT's employ; (4) immediately after her departure from DIRTT, Amanda Buczynski, also a former DIRTT employee, reached out to DIRTT customers on behalf of Falkbuilt in an effort to compete on ongoing projects and undercut DIRTT's bids by utilizing DIRTT confidential

2

information; (5) Falkbuilt, Inc. and Falkbuilt Ltd. misleadingly market their products as having identical or superior characteristics to DIRTT products even though the products are in significant part not similar or identical and are inferior for the purposes of the market; (6) Falkbuilt, Inc. and Falkbuilt Ltd. continue to trade on an alleged connection with DIRTT products and technology, while privately and publicly degrading DIRTT's brand and reputation; and (7) Mogens Smed masterminded and encouraged all of these activities, personally acting within the United States market. In support of their First Amended Complaint, Plaintiffs state as follows:

## BACKGROUND OF THE PARTIES

1.     Plaintiff DIRTT Inc. is a Colorado company, with its principal places of business in Savannah, Georgia and Phoenix, Arizona. DIRTT Inc. is the licensee of the trade secrets at issue in this case.

2.      Plaintiff DIRTT Ltd. is a Canadian company, incorporated in the Province of Alberta and with its headquarters and principal place of business in Calgary, Alberta, Canada. DIRTT Ltd. is DIRTT Inc.'s parent company.  DIRTT Ltd. is the licensor of the trade secrets at issue in this case.

3.     DIRTT is an innovative, technology-driven company that operates in Canada, the United States and other jurisdictions around the world. DIRTT's sales

offices in Salt Lake City, Phoenix, New York, Chicago, Calgary, and Toronto are supported by its factories and distribution centers across the United States and Canada.

4.     Plaintiffs offer products and services for the digital design of component, prefabricated construction to build out interior spaces in buildings (referred to as "interior construction"). Among many other services, Plaintiffs offer clients the ability to utilize virtual-reality to design office, healthcare, and other interior spaces using modular components which can be rapidly and affordably assembled in Plaintiffs' factories and on-site.

5.     Plaintiffs are innovators and leaders in the prefabricated, interior design and construction market space and have been granted over 300 U.S. and foreign patents for the technology in both their building products themselves and the technology to design and fabricate those products.

6.     Plaintiffs use a proprietary software and virtual-reality visualization platform coupled with vertically integrated manufacturing that designs, configures and manufactures prefabricated interior construction solutions used primarily in commercial spaces across a wide range of industries and businesses. Plaintiffs combine innovative product design with their industry-leading, proprietary ICE Software ("ICE Software" or "ICE") and technology-driven, lean manufacturing

4

practices and sustainable materials to provide an end-to-end solution for the traditionally inefficient and fragmented interior construction industry. DIRTT creates customized interiors with the aesthetics of conventional construction, but with greater cost and schedule certainty, shorter lead times, greater future flexibility, and better environmental sustainability than conventional construction.

7.      Plaintiffs offer interior construction solutions throughout the United States and Canada, as well as in select international markets, through a network of independent regional partners ("Regional Partners") and an internal sales team. The Regional Partners use the ICE Software to work with end users to envision and design their spaces. Orders are electronically transmitted through ICE to DIRTT Ltd.'s manufacturing facilities for production, packing and shipping. DIRTT's Regional Partners then coordinate the receipt and installation of DIRTT's interior construction solutions at the end users' locations.

8.      ICE generates valuable proprietary information, including cost and margin information, the components of the bill of materials for individual companies, detailed plans and specifications for projects, and customer requirements.

9.      Apart from ICE, Plaintiffs' internal restricted information and communications network contains other sources of valuable information, including

53682906;25

prospective and current customer databases that include information on potential projects, as well as the status of all pending projects, and a restricted site for individually-approved users to access called "MyDIRTT", which contains confidential technical information such as diagrams and other technical know-how.

10.   Plaintiff's Regional Partners execute confidentiality agreements and have access to confidential information, including pricing and prospective customers.

11.   In addition to sales and marketing, Regional Partners provide value throughout the planning, design and installation/construction process. At the pre-construction stage, Regional Partners provide design assistance services to architects, designers and end clients. Through the installation/construction process, Regional Partners act as specialty subcontractors to the general contractors and provide installation and other construction services. Post move-in, Regional Partners provide warranty work, ongoing maintenance and repurposing support. The Regional Partners operate under Regional Partner agreements with DIRTT, which outline sales goals and marketing territories and provide the terms and conditions upon which the Regional Partners market and sell DIRTT products. Regional partners agree in writing to keep information generated through this process confidential.

53682906;25

12.     Plaintiffs also operate several "DIRTT Experience Centers" ("DXCs") (previously referred to as "Green Learning Centers"), which are display areas used to showcase DIRTT's products and services. Plaintiffs generally require their Regional Partners to construct and maintain a DXC in their local markets. There are currently over 80 DXCs showcasing DIRTT's products and services across North America, the Middle East and India.

13.     DIRTT conducts its North American business in a number of cities, including Salt Lake City, Utah, Chicago, Illinois, New York, New York, and Phoenix, Arizona. DIRTT operates manufacturing facilities in Calgary, Alberta, Phoenix, Arizona and Savannah, Georgia. DIRTT currently has a manufacturing facility under construction near Charlotte, North Carolina.

14.     DIRTT Ltd. is the owner of the trade secret information at issue in this case and licenses the information directly to DIRTT Inc.  DIRTT Ltd. does not sell products directly in the United States, but directly benefits from every DIRTT Inc. sale in the United States.

15.     Mr. Henderson is an individual and a resident of Davis County, Utah.

16.     Mr. Henderson was a DIRTT employee responsible for sales and marketing from at least May 2009 to August 2, 2019, when he departed from DIRTT of his own initiative.

17.    Kristy Henderson is an individual and a resident of Davis County, Utah.

18.    Falk Mountain States, LLC is a Utah Limited Liability Company incorporated in July 2019 by Kristy Henderson, with an address and registered agent in Logan, Utah.

19.    Falkbuilt, Inc. is a Delaware corporation. Falkbuilt, Inc. was established to emulate DIRTT's business model by departed DIRTT employees, including Mr. Henderson and Mogens Smed.

20.    Falkbuilt Ltd. is a Canadian company with offices in Calgary, Alberta, Canada.

21.    Mr. Smed is an individual and a resident of Calgary, Alberta, Canada. Until January 2018, Mr. Smed was the Calgary-based CEO, directly or indirectly controlling DIRTT Inc. and DIRTT Ltd.  He left DIRTT in September 2018.

22.    Additionally, Falkbuilt has created a network of captive and independent representatives, comprised largely of former DIRTT employees and representatives, that it refers to as "Falk Branches".

23.    This action concerns the theft of DIRTT's confidential information (both in the United States and Canada and any other location as revealed), as well as the improper use of that information in connection with the United States

market. Additionally, this action addresses false and misleading statements by Falkbuilt representatives creating confusion in the marketplace and causing Plaintiffs to suffer financial injuries measured under both federal and state law.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action arises under the following federal statutes: 18 U.S.C. § 1836, 18 U.S.C. § 1030 and 18 U.S.C. § 2701. This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as they are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy. The Court also has jurisdiction over the state law claims pursuant to 28 U.S.C. §1332, as there is complete diversity and the amount in controversy exceeds the statutory minimum.

25.    This Court has personal jurisdiction over Mr. Henderson and Mrs. Henderson because they are residents of Davis County, Utah.

26.    This court has personal jurisdiction over Mr. Smed because he directed the wrongful actions of the other defendants that took place in the State of Utah, including but not limited to, directing Mr. Henderson to undertake a conspiracy to misappropriate DIRTT's confidential and trade secret information. Mr. Smed also regularly directs business to the State of Utah through

Falkbuilt Ltd., Falkbuilt, Inc. and Falk Mountain States, LLC. Mr. Smed has also availed himself of the protections of this State by directing the filing of Falkbuilt Ltd.'s Counterclaim against DIRTT in this forum. Based on Mr. Smed's direction of the Utah-based, wrongful activity complained of in this Complaint, Mr. Smed should have reasonably anticipated being haled into a Utah court over claims based on that wrongful activity.

27.    This Court has personal jurisdiction over Falk Mountain States, LLC because it is incorporated in Utah.

28.    This Court has personal jurisdiction over Falkbuilt, Inc. because Falkbuilt, Inc. regularly conducts business in the State of Utah, specifically with Falk Mountain States, Mr. Henderson works for Falkbuilt, Inc. or on its behalf in the State of Utah, and Falkbuilt, Inc. should have reasonably anticipated being haled into a Utah court over claims based on the DIRTT confidential information it obtained from Mr. Henderson, a Utah resident.

29.    This Court has personal jurisdiction over Falkbuilt Ltd. because Falkbuilt Ltd. regularly conducts business in the State of Utah, specifically with Falk Mountain States, Mr. Henderson works for Falkbuilt Ltd. or on its behalf in the State of Utah, and Falkbuilt Ltd. should have reasonably anticipated being

10

haled into a Utah court over claims based on the DIRTT confidential information it obtained from Mr. Henderson, a Utah resident.

30.     Falkbuilt Ltd. also has multiple agents in the United States that hold themselves out as employees and agents of Falkbuilt Ltd., independently establishing jurisdiction over Falkbuilt Ltd.

31.     Falkbuilt Inc.'s and Falkbuilt's agents and employees are directed by Mr. Smed.

32.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the events giving rise to this action occurred in this district, and pursuant to §1391(b)(1) as the Hendersons and Falk Mountain States reside in this district.

## FACTUAL BACKGROUND

33.     Since his difficult departure from DIRTT in September 2018, Mr. Smed and those acting in concert with him, including the newly-formed Falkbuilt entities, have engaged in an ongoing attempt to replicate DIRTT's business, steal DIRTT's clients, and co-opt DIRTT's product characteristics and business reputation as Falkbuilt's own, through improper means, including but not limited to using DIRTT confidential information and trade secrets to identify and approach customers and potential customers, utilizing pricing and margin information to

11

undercut DIRTT's quotes, and sowing confusion in the market by drawing false equivalencies between Falkbuilt's and DIRTT's products and services. These approaches have been made both directly and indirectly through current and former DIRTT Regional Partners.

34.    Despite public statements to the contrary by Mr. Smed that Falkbuilt is not a competitor of DIRTT, DIRTT determined, based on a forensic study of electronic information, that Falkbuilt was built upon, and is dependent on, both information and employees obtained from DIRTT. (Exhibit O at ¶¶ 6, 9). In fact, Falkbuilt would likely not be operating today but for the customer contact information, pricing, estimates and other DIRTT confidential information and trade secrets taken by former DIRTT employees, including Mr. Henderson, for use at their new Falkbuilt businesses started by Mr. Smed. Based on information obtained by DIRTT, as well as publicly available information, Falkbuilt is directly competing with DIRTT.

35.    In order to build a competing company, Mr. Smed recruited DIRTT employees to work for Falkbuilt and, based on available forensic information, encouraged the employees to assist in planning Falkbuilt: (1) while still working for DIRTT; and (2) in reliance upon DIRTT confidential information. Mr. Smed knew, as the former DIRTT CEO, that each of these employees had contractual,

statutory, and common law obligations to maintain the confidentiality of DIRTT confidential information.

36.     Falkbuilt has directly bid against DIRTT on projects using DIRTT Confidential Information.

37.     Further, while not independently wrongful, Falkbuilt has built its distribution system for Falkbuilt products in the United States around current and former DIRTT distributors.  Those partners target the same customers and markets as DIRTT.

38.     Upon information and belief, Mr. Smed not only actively recruited DIRTT employees to join Falkbuilt, including meeting with certain DIRTT employees in advance of their leaving DIRTT's employ, but also encouraged them to solicit other DIRTT employees to work for or on behalf of Falkbuilt. Additionally, on information and belief, Mr. Smed emboldened those same individuals to take with them DIRTT information that they utilized while in DIRTT's employ, and to misappropriate DIRTT's confidential, competitive information to assist Falkbuilt in quickly getting up-to-speed and operational, and to undercut DIRTT's bids and estimates, with the end goal of ultimately taking DIRTT's customers and projects. It is no coincidence that Falkbuilt is bidding on the same projects as DIRTT and contacting DIRTT's customers and prospective

customers, as well as preventing DIRTT from even learning of potential projects by using confidential information to divert business to Falkbuilt through current and former DIRTT Regional Partners.

39.     As can be seen from Falkbuilt's website, www.falkbuilt.com (advertising interior component construction for healthcare, commercial and office, and education), Falkbuilt competes in the same market as DIRTT, www.dirtt.com (advertising projects in education, healthcare, office space, residential, government, and hospitality). Additionally, Falkbuilt's webpages and designs mimic DIRTT's appearance. To date, over 50 DIRTT employees have joined Falkbuilt, either working for it or on its behalf. The breach of Mr. Smed's common law employment obligations and express contractual obligations to DIRTT is the subject of ongoing litigation in Alberta, Canada and will be adjudicated by the Canadian courts.

## A.     Falkbuilt's Campaign of Misinformation

### 1.     Ms. Buczynski's Misattributions

40.     Amanda Buczynski was a DIRTT employee from October 17, 2016 to September 17, 2019. She was responsible for DIRTT sales in a territory that included Western Pennsylvania and West Virginia. She maintained an office on site at a DIRTT Regional Partner's facility in Pittsburgh, Pennsylvania.

53682906;25

41.     Immediately after her departure from DIRTT, Ms. Buczynski began working for Falkbuilt, where she is Director of Design and Construction.

42.     On behalf of Falkbuilt, Ms. Buczynski walked at least one potential customer through the showroom of one of DIRTT's Regional Partners in Ohio, and misrepresented to this potential customer that the DIRTT installations in the showroom were created by Falkbuilt, not DIRTT. The DIRTT installations in the showroom consisted of ready-for-market examples of DIRTT's products, used to allow DIRTT's customers to place custom orders.

43.     Ms. Buczynski has also referred to Falkbuilt as "the new DIRTT" or "DIRTT 2.0", in communications with potential customers, further clouding the issue of which entity originated DIRTT's products and services, and contradicting Falkbuilt's public representations that Falkbuilt is not competing with DIRTT or building upon DIRTT technology and information.

44.     Ms. Buczynski knew that these statements were false when she made them, and she made them with the intent to deceive potential DIRTT customers into believing that DIRTT's products are actually those of Falkbuilt for the purpose of steering those customers away from DIRTT to Falkbuilt.

   **2.     Falkbuilt's Misdesignation and Misdescription of the Origin of Its Products and Services**

45.     Falkbuilt's products and services are demonstrably not equivalent to DIRTT's, yet Falkbuilt continues to intentionally sow confusion in the market to leverage DIRTT's products, services, and reputation as its own.

46.     Falkbuilt is also mimicking DIRTT's designs and diagrams in its promotional materials, misdesignating the origin in its techsheets and brochures as Falkbuilt. DIRTT's designs and diagrams are essential to DIRTT's business in that they allow DIRTT's customers to place custom orders. Falkbuilt issues "techsheets" describing the technical features and performance capabilities of the various components that it purports to offer. (See Ex. Q). Falkbuilt also issues illustrated brochures depicting the various installations that it claims to be able to construct and deliver. (See Ex. R). The diagrams and products in these techsheets and brochures are so similar to those offered by DIRTT as to be virtually indistinguishable.

47.     It took DIRTT years to develop its proprietary products and their components.   Falkbuilt, on the other hand, has purportedly developed its "digital construction" process and its components seemingly overnight. Upon information and belief, Falkbuilt does not actually currently possess the capabilities it is advertising, necessitating the mimicking of DIRTT's designs and diagrams, and the misdesignation of the origin of Falkbuilt's techsheets and brochures as

Falkbuilt. As alleged herein, several former DIRTT employees took DIRTT's confidential and proprietary information with them to Falkbuilt, which has inevitably aided Falkbuilt's ramp-up efforts.

48.   The similarity of Falkbuilt's promotional material to that of DIRTT is no coincidence. Falkbuilt's use of advertising and promotional materials that are indistinguishably different from DIRTT's, including the language and images used, the narrative history of Falkbuilt, and the value proposition, is a key part of its overall effort to knowingly deceive potential customers into believing that Falkbuilt's work is actually that of DIRTT.

49.   However, Falkbuilt's products do not have the same capabilities and characteristics as DIRTT products. By way of example, to DIRTT's knowledge, Falkbuilt does not offer tamper-evident tile functionality. Falkbuilt does not offer a foldable wall system with the same functionality as the rest of the product line, instead offering a third-party stacking wall only. Falkbuilt does not possess a system to permit mitered tiles to meet at a corner with no end cap. Falkbuilt's tiles mount only at the verticals, and must end at a vertical post, or the tile must be extended unsupported past the vertical. If Falkbuilt wants a shelf, cabinet or work surface to extend from the tiles, the location must be predetermined and holes must be cut in the tiles. The shelf or cabinet cannot be relocated horizontally without

having new tiles cut and internal mounting componentry moved by a technician. DIRTT, though, possesses a horizontal mounting channel that permits any hanging component to be moved on a horizontal axis at will. In fact, the technology underlying Falkbuilt's solutions is not advanced as compared to the technology underlying DIRTT's solutions.

50.    Additionally, unlike DIRTT, which uses actual wood veneer, matching the tile veneer perfectly, Falkbuilt uses vinyl-wrap "Falkskin" on its metal components to emulate woodgrain. Falkbuilt's sit-stand solutions also have visible actuator housings, while DIRTT's actuator housings are concealed under the work surface with the drive mechanisms hidden inside the wall.

51.    From a functionality standpoint, Falkbuilt fails to offer the re-configurability of DIRTT's products. For example, DIRTT's sliding door supports allow a door to easily be moved from one point to another or changed out for another door simply by moving the support, which mounts into a horizontal mounting channel, to another location. No screw holes or other marks are left behind. Additionally, should a section of a wall require reconfiguration, such as a glass wall replacing a solid wall, that single section can be removed and replaced without disturbing adjacent wall sections. Falkbuilt's walls, which are built sequentially, would require each section to be disassembled, beginning at the end

18

of the wall until the section to be replaced was reached. Finally, DIRTT's capabilities allow it to place walls at virtually any angle, with no ramifications when reconfigured to another angle. No drilling or damaging tile at the intersection of the walls is required. In other words, to be the functional equivalent of DIRTT, Falkbuilt would have to offer an easily reconfigurable wall system including infinite horizontal positioning (and re-positioning) of hanging components, without compromising aesthetics. Falkbuilt's system offers none of these things.

52.    Moreover, DIRTT and Falkbuilt use different materials in their systems, which renders Falkbuilt unable to provide DIRTT's advantages. DIRTT uses aluminum in its solutions, which allows for much more flexible functionality. The aluminum extrusions used in DIRTT's solutions can be formed in virtually any shape necessary, meaning DIRTT can design any shape needed to accomplish the solution's intended functionality. Falkbuilt, on the other hand, uses steel, which is much more rigid and offers far less flexibility in shaping. Because Falkbuilt relies on steel, it cannot achieve the flexibility of design and reconfigurability that DIRTT offers in its solutions. For this reason, it is not just Falkbuilt's false claims of equivalency to DIRTT that are misleading to customers, but also its own promotional material, which touts that Falkbuilt's solutions are "easily reconfigured" and have "endless design options."

53682906;25

53.     Similarly, Falkbuilt does not at present possess in-house design capabilities, which is an aspect of DIRTT's solution that greatly increases the customizability of its solutions for DIRTT customers. Rather, Falkbuilt relies on external designers to create its solutions, making it much more difficult, if not impossible in some instances, to achieve the customizability necessary to achieve the customers' desired functionality.

54.     As such, Falkbuilt's attempts to equate the characteristics of its solutions with those of DIRTT constitute a blatant effort to confuse customers and capitalize on the superior characteristics of DIRTT's solutions as compared to Falkbuilt's for the same purposes, and suggest that DIRTT and Falkbuilt are the same, or that Falkbuilt's solutions are an equivalent alternative. The fact is, Falkbuilt and DIRTT are simply not equivalents.

55.     Falkbuilt further misrepresents the size and capabilities of its United States operations, as its allegedly independent representatives claim to be Falkbuilt employees.

56.     Despite Falkbuilt's contention that it does not compete with DIRTT, these efforts are intended to damage, and have damaged, DIRTT by luring potential customers away from DIRTT to Falkbuilt. For example, a number of existing DIRTT projects have been converted to Falkbuilt projects due to

Falkbuilt's interference. Similarly, DIRTT has lost competitive bids on projects to Falkbuilt as a result of Falkbuilt's false claims of equivalency with DIRTT. In one instance, DIRTT lost the bid for phase 2 of a project for which DIRTT had done a full solution installation for phase 1 in 2018-2019. Falkbuilt was a competitor on this bid, and would not have won the bid but for its false claims of equivalency and use of DIRTT's competitive information. In another example, bid documents from the architects for a particular project DIRTT and Falkbuilt were both competing for had to be amended to clarify that the basis of the design was Falkbuilt, not DIRTT, but noted that DIRTT was an acceptable equivalent manufacturer. This amendment came after a DIRTT representative had a detailed conversation with the architectural firm issuing the bid documents, and explained exactly what Falkbuilt is vis-à-vis DIRTT – i.e. a competitor, wholly separate from DIRTT, and not the "new DIRTT".

57. Falkbuilt further trades on DIRTT's technology, heritage, and reputation. One of the clearest examples is that Mr. Smed continues to identify himself as a "DIRTTbag," a phrase used by DIRTT employees to describe themselves and to express pride in adhering to DIRTT's philosophy. A collection of representative Tweets from Mr. Smed is attached as Exhibit S. Falkbuilt has created a false impression that it is doing what DIRTT has done in the industry for

53682906;25

the last several years, and intentionally attempts to market itself as associated with, or even part of, DIRTT in order to capitalize on DIRTT's reputation, historical performance, and customer base despite Falkbuilt's inferior products. Falkbuilt uses the same language, same images, and the same value proposition as DIRTT to further this effort and to confuse customers in the marketplace.

58.    As further evidence of Falkbuilt's positioning of itself as the same as DIRTT, upon information and belief, Mr. Smed has approached clients of DIRTT to be references for Falkbuilt, based only on their past experience with DIRTT, not Falkbuilt.

59.    Mr. Smed has further denigrated DIRTT publicly, and to customers and parties, indicating falsely that Falkbuilt is a successor to DIRTT's technological heritage.

60.    As a result, the marketplace is highly convoluted and confused. Customers who have a history with DIRTT are now being approached by a company with many of the same people, a purportedly similar product, and a nearly identical value proposition and origin story.  In other words, due to Falkbuilt's tactics of passing itself off as "DIRTT 2.0", many customers view Falkbuilt as having some positive association with DIRTT. Some customers have

even misunderstood Falkbuilt as either a new division of DIRTT or the same company, but with a new name.

**B.    The Hendersons' Utah Conspiracy**

61.    DIRTT Inc. hired Mr. Henderson as a sales representative. In that capacity, he was entrusted with a variety of significant confidential and proprietary information and trade secrets pertaining to DIRTT's business ("DIRTT Confidential Business Information") and owed DIRTT a fiduciary duty with respect to such DIRTT Confidential Business Information. At the time he was hired, Mr. Henderson agreed in writing to maintain the confidentiality of DIRTT's trade secrets and confidential information.

62.    In a May 21, 2009 agreement, Mr. Henderson agreed to DIRTT's terms and conditions regarding his employment, including that he "would not . . . divulge to any other person whosoever and will use [his] best endeavors to prevent unauthorized publication or disclosure of any trade secret, manufacturing process or confidential information concerning the Company and related companies or the finances of the Company and related companies or any of their respective dealings, transactions or affairs which may come to [his] knowledge during or in the course of [his] employment." (Exhibit A).

63.    On   June   25,   2019,   Mr.   Henderson   acknowledged   DIRTT's
Computer/Data Security Policy (Exhibit B), which states in relevant part that:

> This  document  is  not  intended  to  displace  any  non-disclosure
> obligations, but rather to ensure proper data security. Please read the
> following provisions carefully and thoroughly before signing.

POLICIES / PROCEDURES

1.    Personnel are prohibited from accessing any computer or
network location for which they have not previously received proper
authorization, and from altering any data or database other than that
which is specifically authorized as required in the performance of his
or her job functions.

2.    Sensitive  or  confidential  data/information  may  not  be
stored  or  referenced  via  systems  or  communication  channels  not
controlled by DIRTT. For example, the use of external e-mail systems
or data storage systems not hosted by or approved by DIRTT, is not
allowed.

3.    Secure passwords are to be used on all systems as per the
DIRTT password policy. These credentials must be unique and must
not  be  used  on  other  external  systems  or  services.  Passwords  or
security codes are not to be disclosed to anyone else; do not allow
others  to  use  your  IDs  and/or  passwords.  Password(s)  must  be
changed whenever the need exists; such as someone else learning your
password,  or  the  password  becoming  known  during  problem
resolution or day-to-day functions, or when requested by DIRTT I.T.

4.    DIRTT I.T. is to be notified immediately in the event that
a company device is lost. (mobile phones, laptops etc.).

5.    In the event that a system or process is suspected as not
being compliant with this policy, immediately notify your supervisor
and/or DIRTT I.T. so they can take appropriate action.

6.     Personnel assigned the ability to work remotely must take extra precautions to ensure that data is appropriately handled.

64.     Mr. Henderson's responsibilities included interfacing with customers, understanding and promoting DIRTT's products, services, and technology, and identifying new potential customers and partners for DIRTT in the southwestern United States. In connection with his job, Mr. Henderson was provided with extensive access to DIRTT Confidential Business Information concerning those markets.

65.     Mr. Henderson was also issued a company laptop with access to DIRTT computer resources, including other networked computers, shared file resources, and other repositories of electronically stored information.

66.     Mr. Henderson was not authorized to access, store, or retrieve DIRTT Confidential Business Information other than using DIRTT computers and resources, and then only for bona fide business purposes for the benefit of DIRTT.

67.     In May 2019, DIRTT's Human Resources department received an administrative garnishment order from the State of Utah for $11.3 million, which DIRTT learned was related to Mr. Henderson's 2003 felony securities fraud convictions. (Exhibit C). Until receipt of the garnishment order, DIRTT's then current management team was unaware of Mr. Henderson's felony convictions.

68.     Mr. Henderson's crimes were quite serious. According to press accounts of his sentencing, he pled guilty to a number of felony counts involving his stealing between $6 million and $8 million from investors in fraudulent business ventures, ultimately serving time in prison based on his convictions. *See* "Swindler Sentenced," KSL.com, 6/21/03 (available at https://www.ksl.com/article/90261/swindler-sentenced, last retrieved 4/9/20).

69.     Press reports of Mr. Henderson's sentencing hearing note that over 64 known victims, many of them senior citizens, lost their life savings and retirement pensions to Mr. Henderson's fraudulent scheme. Mr. Henderson was ordered to repay those funds.

70.     While Mr. Smed was aware of these convictions while acting as DIRTT's CEO, he nonetheless regularly supported Mr. Henderson in his role at DIRTT. In fact, when the local Regional Partner in Salt Lake City expressed a desire not to work with Mr. Henderson, Mr. Smed arranged for another Regional Partner in Salt Lake City, Interior Solutions, to work specifically with Mr. Henderson. Importantly, Mr. Henderson's wife, Defendant Kristy Henderson, was, and is, the branch manager of Interior Solutions' Salt Lake City office.

71.    The receipt of the wage garnishment order by DIRTT, of which Mr. Henderson quickly became aware, touched off a series of events for Mr. Henderson and DIRTT.

72.    In 2019, after Mr. Smed's departure from DIRTT but before receipt of the wage garnishment order, DIRTT's senior management were considering Mr. Henderson for a promotion.

73.    Upon learning about Mr. Henderson's prior criminal convictions, current DIRTT management provided Mr. Henderson a number of opportunities to explain his actions and provide his version of events. During that process, his anticipated promotion was placed on hold.

74.    Mr. Henderson apparently determined at that point in time to leave DIRTT and return to work for his prior supporter, Mr. Smed, at Falkbuilt and to take valuable DIRTT Confidential Business Information with him.

75.    After DIRTT received the garnishment order and placed Mr. Henderson's promotion on hold, Mr. Henderson commenced or continued a scheme to misappropriate DIRTT's confidential and propriety information and trade secrets by uploading DIRTT Confidential Business Information onto a personal, cloud-based data storage location. There was no legitimate business purpose for this activity.

76.     On information and belief, in or around this same time period, Mr. Henderson either made contact or accelerated plans with Mr. Smed and Falkbuilt to assist them in launching a business in Utah to compete with DIRTT, utilizing DIRTT Confidential Business Information to do so.

77.     The departure of his primary benefactor at DIRTT, Mr. Smed, coupled with the forthcoming garnishment (which would far exceed Mr. Henderson's DIRTT salary for over 100 years), likely accelerated Mr. Henderson's plans to misappropriate information from DIRTT for Mr. Smed's new venture.

78.     Starting on Sunday, June 3, 2019, Mr. Henderson began uploading what would ultimately amount to over 35 gigabytes of data[1] from his DIRTT-issued laptop and account to Google "Google Drive" and/or Apple "iCloud" cloud computing servers.

79.     DIRTT IT staff became aware of the unauthorized access to and exfiltration of information from DIRTT's systems on June 10, 2019.

80.     When DIRTT confronted Mr. Henderson about uploading this information, he admitted to uploading the data but denied any improper motive, and purported to allow his cloud account to be removed of such data by DIRTT.

---

[1] On average, one gigabyte contains 4400 documents, depending on the file type.

81.    Further investigation has revealed that, in addition to uploading DIRTT Confidential Business Information to a cloud server, Mr. Henderson had also likely mirrored DIRTT Confidential Business Information to a personal external hard disk drive, which was not authorized by DIRTT.

82.    To date, the unauthorized hard disk drive remains in Mr. Henderson's possession. DIRTT reasonably believes that the unauthorized hard disk drive contains DIRTT Confidential Business Information.

83.    The files wrongfully taken by Mr. Henderson included materials which he would not have a need or reason to access in his day-to-day employment at DIRTT, including design and pricing information and proprietary ICE design files and Standard Factory Net (SFN) price lists for projects which had no connection to his employment at DIRTT.

84.    The files obtained by Mr. Henderson appear to include hundreds of design, layout, pricing, and other files regarding projects, regions, and customers far outside of Mr. Henderson's responsibilities at DIRTT.

85.    Examples of the files misappropriated by Mr. Henderson include: (a) specific budget proposals for projects; and (b) ICE files and SFN summaries, which could be used against DIRTT in bidding for projects because they contain pricing information, among other valuable data.

53682906;25

86.    In the weeks leading up to his departure, Mr. Henderson began separately, affirmatively seeking out information from other DIRTT employees regarding internal company processes, particularly pricing, testing, and structural calculation processes under the guise of improving his knowledge of DIRTT company practices for DIRTT's benefit. Mr. Henderson did so despite the fact that he already knew at the time that he would be leaving DIRTT and assisting Falkbuilt in creating a competing business in Utah, Falk Mountain States, LLC.

87.    Shortly after DIRTT's receipt of the garnishment order, Mr. Henderson indicated that DIRTT should terminate its relationship with Interior Solutions, the company where his wife works. DIRTT then terminated the relationship in a negotiated exit based on Mr. Henderson's recommendations.

88.    In her role at Interior Solutions, Kristy Henderson had access to DIRTT Confidential Business Information.

89.    In entering into a Regional Partner Agreement with DIRTT, Interior Solutions agreed in March 2018 that it would not "copy, use, disclose or transfer" any DIRTT confidential information. (Exhibit D). The confidential information included ICE files, SFN pricing, ICE quotes, and final approved ICE files. Interior Solutions also agreed to adhere to the proprietary license with respect to its use of ICE software.

53682906;25

90.   On July 8, 2019, Kristy Henderson, Mr. Henderson's wife, incorporated Falk Mountain States, LLC. Kristy Henderson, through her work at Interior Solutions as a DIRTT Regional Partner, possessed significant knowledge about DIRTT's operations.

91.   On information and belief, Falk Mountain States, LLC was intended to be, and is, an affiliate of Falkbuilt, a direct competitor of DIRTT set up by former DIRTT employees. Falk Mountain States' filings with the State of Utah indicate that Falk Mountain States is doing business as "Falkbuilt, Salt Lake City" and "Falkbuilt, St. George".

92.   Mr. Henderson resigned from DIRTT effective August 2, 2019 on several weeks' notice.

93.   Although Kristy Henderson had already formed Falk Mountain States, LLC at the time of his resignation, Mr. Henderson told DIRTT that he was leaving to launch a construction company with his wife, Kristy Henderson, and to develop some commercial property that had "been in the works" for 15 years. Mr. Henderson never informed anyone at DIRTT that he was actually going to work for Mr. Smed at Falkbuilt, but instead intentionally misled DIRTT regarding his plan to begin working for a direct competitor.

94.     On August 8, 2019, Mr. Henderson contacted at least one prospective customer of DIRTT "announcing" his and other former DIRTT employees' departures to launch a new competitor to DIRTT. Mr. Henderson's email asked the prospective customer to allow the new entity to bid on an existing project with which he was familiar based on his employment with DIRTT.

95.     While still employed by DIRTT, in direct violation of his fiduciary duties owed to DIRTT, Mr. Henderson conspired with Kristy Henderson and Falk Mountain States to obtain and misappropriate DIRTT Confidential Business Information, including trade secrets, to benefit himself, Kristy Henderson, Falkbuilt and Falk Mountain States.

96.     Mr. Smed directed and encouraged these efforts by Mr. and Mrs. Henderson to obtain and misappropriate DIRTT Confidential Business Information.

**B.     Other Efforts to Misappropriate DIRTT Confidential Business Information**

97.     The Hendersons are not the only individuals engaged by Mr. Smed and Falkbuilt to gain access to DIRTT Confidential Business Information.

98.     As part of her job responsibilities with DIRTT, Ms. Buczynski had access to proprietary databases of customer relationships, pricing, costing, and

32

forecasts accessible only to herself, the CEO, and the COO of DIRTT's regional partner.

99.     Ms. Buczynski, as part of her employment with DIRTT, agreed to a confidentiality agreement which provided, among other things, that she would not "without the prior written consent of DIRTT, either during the period of [her] employment or at any time thereafter, disclose or cause to be disclosed any of the Confidential Information in any manner …" (Exhibit E).

100.   Ms. Buczynski also agreed to confidentiality provisions in the DIRTT offer letter she executed on September 30, 2016.

101.   Ms. Buczynski resigned from DIRTT effective September 17, 2019, as with Mr. Henderson, falsely stating to her colleagues that she was not leaving to work for Falkbuilt.

102.   On Ms. Buczynski's last day, she plugged a USB device with a serial number that included 4A3BCF57-0 into her DIRTT-provided laptop. She also accessed a number of files and folders on her work computer's hard drive related to ongoing DIRTT projects. Ms. Buczynski did not possess authorization to undertake any of these acts. (Exhibit F; Exhibit O at ¶ 9).

103. On August 30, 2019, prior to her departure from DIRTT, Ms. Buczynski copied over 40 files, including one identified as "PPT 'Large Clients'" to a Dropbox directory/folder. (Exhibit G).

104. In fact, as noted above, Ms. Buczynski started working on behalf of Falkbuilt immediately following her departure from DIRTT.

105. Immediately after leaving DIRTT's employ, Ms. Buczynski reached out to one or more DIRTT customers on behalf of Falkbuilt in an effort to compete on ongoing projects and to underbid DIRTT by utilizing DIRTT's Confidential Business Information and information obtained from DIRTT's partner. (Exhibit H).

106. On information and belief, Ms. Buczynski also worked to advance Falkbuilt's interests to the detriment of DIRTT by either hiding or sitting on leads that she received in the time leading up to her departure, including inquiries from potential partners interested in working with DIRTT.

107. After submitting her resignation to DIRTT, Ms. Buczynski also emailed to her personal email account DIRTT customer contact information, and DIRTT pricing and estimates. (Exhibit I).

108.   Ms. Buczynski's and Mr. Henderson's conduct is part of a pattern of a larger number of former DIRTT employees solicited by Falkbuilt (*see* Exhibit O at ¶ 9):

(a)   On December 28, 2018, Christina Engelbert, while a DIRTT employee, received an email from Dropbox instructing her to "Complete your Dropbox setup." The email indicated that Ms. Engelbert had created a Dropbox account. Ms. Engelbert left DIRTT on December 31, 2018 and subsequently went to work for or on behalf of Falkbuilt. (Exhibit J).

(b)   On December 29, 2018, Clayton Smed, while a DIRTT employee, received an email from Dropbox instructing him to "Complete your Dropbox setup." The email indicated that Mr. Smed had created a Dropbox account. Clayton Smed changed the email associated with his Dropbox account from his DIRTT email to his personal email on January 14, 2019. Clayton Smed left DIRTT on January 31, 2019 and subsequently went to work for or on behalf of Falkbuilt. (Exhibit K).

(c)   On January 12, 2019 Laura Shadow, while a DIRTT employee, received an email from Dropbox instructing her to "Complete your Dropbox setup." The email indicated Ms. Shadow had created a Dropbox account.

Ms. Shadow left DIRTT's employ on January 31, 2019 and subsequently went to work for or on behalf of Falkbuilt. (Exhibit L).

109.   On September 19, 2018, David Weeks sent Mogens Smed a sensitive, confidential DIRTT document titled "Typical Headwall Cost Breakdown". This information constitutes DIRTT Confidential Business Information. Mr. Weeks left DIRTT on Feb. 28, 2019 and went to work for Mr. Smed at Falkbuilt. (Exhibit M). Mr. Weeks forwarded similar pricing information to his personal email account in November 2018.

110.   Ingrid Schoning (who left DIRTT on September 15, 2019) forwarded a DIRTT confidential document to her Gmail account. This information constitutes DIRTT Confidential Business Information. Ms. Schoning now works for or on behalf of Falkbuilt. Ms. Schoning also changed a Dropbox account to associate it with her personal email address on July 23, 2019. (Exhibit N).

111.   Jordan Smed (who left DIRTT on January 31, 2019) accessed CAD design files at an abnormally high rate just prior to his departure from DIRTT. Mr. J. Smed accessed CAD files a total of 281 times over a period of nearly *six years* from 2012 to October 2018. In the three months prior to his departure from DIRTT, he accessed the CAD files 714 times, with 449 of those times being in the month of his departure.  Mr. J. Smed also sent DIRTT pricing information, as well

as shipping and forecast reports, to his personal email in the two weeks prior to his departure, including on his very last day of employment with DIRTT.

112.   Defendants are using and have misappropriated DIRTT Confidential Business Information, and DIRTT has reason to believe that Defendants' actions are ongoing and widespread and directed by Falkbuilt.

113.   Plaintiffs have reason to believe, based upon direct knowledge of information actually taken, the facial similarity of DIRTT and Falkbuilt products, and the direct approach of Falkbuilt to DIRTT customers and partners with the purportedly similar products, that the theft was far more widespread than currently known.

114.   DIRTT seeks all relief available at law and in equity including, but not limited to, preliminary and permanent injunctive relief to restrain Defendants from using or disclosing DIRTT Confidential Business Information. DIRTT requests injunctive relief to protect itself from irreparable injuries caused by Defendants' conduct and to prevent further harm. DIRTT also seeks an award of compensatory damages, exemplary damages, and attorney's fees.

## C.   DIRTT Confidential Business Information Constitutes Trade Secrets

115.   DIRTT's manufacturing approach is built on a foundation of technology, the center of which is the proprietary ICE Software. DIRTT uses ICE

Software to design, visualize, configure, price, communicate, engineer, specify, order and manage projects. The ICE Software was developed in or around 2005 as a custom interior design and construction software solution to integrate into DIRTT's offerings. The ICE Software makes manufactured, fully custom interiors both feasible and profitable while addressing challenges associated with traditional construction, including cost overruns, inconsistent quality, delays, and significant material waste. The ICE Software is used throughout the sales process, ensuring consistency across DIRTT's services and products received by all of DIRTT's clients.

116.   DIRTT begins manufacturing custom DIRTT products once a file (an "ICE File") is generated and a purchase order is received. The ICE Software allows an entire project to be tracked and managed across the entire production cycle through design, sales, production, delivery and installation. The ICE File (containing a project's engineering and manufacturing data) generated during the design and specification process can be used for optimizing future reconfigurations, renovations, technology integration initiatives and changes to a client's space.

53682906;25

117.   The ICE Software is licensed to unrelated companies and Regional Partners of DIRTT, but only for certain limited information and only if the parties agree to be bound by a confidentiality agreement.

118.   DIRTT's proprietary ICE Software is among a body of DIRTT's valuable intellectual property. The ICE Software is subject to a number of patents in Canada, the United States, Europe and Singapore. DIRTT also has a number of trademark and copyright protections related to the ICE Software.

119.   ICE files generated by ICE Software contain proprietary costing information that would be of substantial benefit to a competitor seeking to undercut DIRTT on price. Costing is a closely-guarded secret at DIRTT for this reason, and because of the substantial efforts utilized to generate it.

120.   In addition to the ICE Software, during their employment with DIRTT, Mr. Henderson, Ms. Buczynski, and other former DIRTT employees had access to DIRTT Confidential Business Information, including but not limited to:

   (a)   DIRTT's job costing;

   (b)   DIRTT's customer and supplier lists, and a list of prospects and projects;

   (c)   DIRTT's sales figures and projections;

   (d)   DIRTT's pre-use customer presentations and marketing materials;

(e)     DIRTT's marketing and sales strategies;

(f)     DIRTT's customer, supplier and Regional Partner order histories, needs, and preferences;

(g)     DIRTT's customer proposals, service agreements, contracts and purchase orders;

(h)     DIRTT's plans to expand and target new clients and markets;

(i)     design specifications and drawings of DIRTT products;

(j)     specialized methods and processes used to create custom prefabricated modular interior wall partitions, other ocular interior components and other DIRTT products;

(k)     research and development of new DIRTT products;

(l)     trade secrets and intellectual property strategy, including strategy regarding the ICE Software and ancillary programs;

(m)     strategic plans and business plans; and

(n)     library of prior projects and customer needs, impossible to replicate without access to DIRTT's confidential system.

This information comprises DIRTT Confidential Business Information.

121.   DIRTT Confidential Business Information is comprised of thousands of different files and documents. And while DIRTT is aware that some of the files constituting DIRTT's Confidential Business Information were taken (or retained) without authorization, due to the volume of information that individuals such as Mr. Henderson, Mr. Jordan Smed, and Ms. Buczynski had access to, it is nearly

impossible for DIRTT to identify every individual stolen file at this time, until or unless Defendants comply with their discovery obligations.

122.   Further, given Mr. Smed's close personal relationship with many of the departing DIRTT employees, DIRTT has reasonably concluded that such information was widely shared within Falkbuilt Inc. and Falkbuilt Ltd. and directed by Mr. Smed.   Additionally, considering that Falkbuilt's regional branches are investors in Falkbuilt, are personally close to Mr. Smed, and that Falkbuilt issues email addresses to the branches, maintains the servers for them and stores emails for the branches, DIRTT believes the information is shared with Falkbuilt partners.

123.   DIRTT devotes significant resources to developing DIRTT Confidential Business Information.

124.   DIRTT Confidential Business Information constitutes trade secrets of DIRTT. It is vital to DIRTT's business success and enables it to compete effectively in an extremely competitive marketplace. DIRTT takes reasonable measures to protect and maintain the confidentiality of DIRTT Confidential Business Information, including the measures described above.

125.   DIRTT derives substantial economic value from maintaining the secrecy of its DIRTT Confidential Business Information, including, among other things, its pricing, its customer, prospect, and supplier information, its sales figures

and projections, its marketing and sales strategies, its technical-know-how, its design specifications, and its strategic and business plans. Any of this information would be immensely valuable to a competitor, and a global theft of the information would allow a competitor an unfair advantage in bidding against DIRTT on projects. DIRTT has incurred significant costs and expenses in developing its DIRTT Confidential Business Information.

126.   DIRTT Confidential Business Information, including, among other things, pricing, its customer, prospect and supplier information, its sales figures and projections, its marketing and sales strategies, its design specifications, and strategic and business plans, is neither generally known, nor is it readily ascertainable, to the general public, to DIRTT's competitors, or to any other person or entity that could obtain value from such information.

127.   DIRTT takes reasonable measures to protect and maintain the secrecy of its DIRTT Confidential Business Information, including, among other things, its pricing, its customer, prospect, and supplier information, its sales figures and projections, its marketing and sales strategies, its design specifications, and its strategic and business plans.

128.   DIRTT limits access to DIRTT Confidential Business Information, and requires network passwords to access DIRTT Confidential Business

Information on DIRTT's computers, confidential agreements, warranty on ICE Software, and partner confidentiality agreements. DIRTT also has policies and procedures in place governing the access to and use of DIRTT Confidential Business Information, including efforts described above to identify attempts to improperly transfer DIRTT Confidential Business Information.

**D.     Falkbuilt directly and unlawfully competes with DIRTT, Inc.**

129.   Despite Falkbuilt's claims to the contrary, since its formation, Falkbuilt has attempted to compete in the same market as DIRTT, Inc. Not only is Falkbuilt attempting to compete in exactly the same market as Plaintiffs, but it is also attempting to steal DIRTT, Inc.'s customers and convert existing DIRTT, Inc. projects into Falkbuilt projects through unlawful means, including through its controlled regional representatives and partners. The regional branches are largely investors in Falkbuilt, and many hold themselves out as employees or principals of Falkbuilt, Ltd. The email servers for these purported independent businesses are controlled and maintained by Falkbuilt, Ltd.

130.   By way of example, in June 2020, Mr. Smed, on behalf of Falkbuilt, met with representatives from a DIRTT client. During this meeting, Mr. Smed discussed the DIRTT project, and made accusations regarding DIRTT with the

intent of sowing suspicion and doubt about DIRTT's ability to complete the project.

131. Similarly, one of DIRTT's Regional Partners in New York has already begun transitioning from selling DIRTT products to also selling Falkbuilt products. In addition to selling Falkbuilt products in the same market as DIRTT products, this partner has converted existing DIRTT projects into Falkbuilt projects. Such a transition of DIRTT projects to Falkbuilt projects will directly result in a loss of business and revenue for DIRTT.

132. One of DIRTT's partners in Cleveland has similarly used its dual relationship with DIRTT and Falkbuilt to Falkbuilt's advantage. Specifically, DIRTT lost the bid for the second phase of a project for which DIRTT had done a full solution installation for the first phase in 2018 to 2019. DIRTT had informed its Regional Partner of the opportunity to bid on the second phase, which the partner then wrongfully disclosed to Falkbuilt. Despite DIRTT's involvement in the project and what it believed was a competitive bid, DIRTT lost the bid. In other words, Falkbuilt has demonstrated a pattern of using DIRTT's partner network in an effort to gain exposure to DIRTT's competitive information. While DIRTT does not suggest that Falkbuilt should refrain from recruiting certain partners, it is certainly improper to use DIRTT's partners to gain access to

53682906;25

confidential information, such as bid pricing, in order to gain an unfair advantage in Falkbuilt's direct competition with DIRTT, or to promote a false equivalency with DIRTT products.

133.   Falkbuilt and Mr. Smed have created confusion in the marketplace by:

(a)   Presenting Falkbuilt services to customers, including DIRTT customers and prospects, and misrepresenting the characteristics of such products and services by stating and representing that Falkbuilt products can replace DIRTT products with the full range of customization and functionality. In fact, for one project, the customer was so misled by Falkbuilt's statements concerning the similarity between DIRTT and Falkbuilt that the project documents had to be formally amended to clarify that the design was based on Falkbuilt's solution, and that DIRTT was an acceptable alternative as a manufacturer. This change was only made after a DIRTT representative had an in-depth conversation with the architect for the project, explaining the substantial difference between DIRTT and Falkbuilt.

(b)   Repeatedly and falsely claiming an affiliation with DIRTT, as Mr. Smed refers to DIRTTBAGS and DIRTT through social media, wrongly suggesting an affiliation, and that Falkbuilt's technology is a lawful outgrowth of DIRTT technological heritage.

(c)      Degrading DIRTT to DIRTT customers and partners by falsely announcing departures of DIRTT partners, falsely representing DIRTT's ability to perform its obligations with its customers, and falsely referring to the destruction of the company by current management.

134.   Falkbuilt's own materials illustrate the extent to which Falkbuilt and its allegedly independent regional branches are intertwined. In one presentation, Falkbuilt claims that over 85% of Falkbuilt's branches are investors in Falkbuilt, and over 66% of the total capital for Falkbuilt was raised directly from the branches. With the branches having so significant a financial stake in Falkbuilt, it is clear that they, too, have an incentive to use DIRTT information to leverage a competitive advantage for Falkbuilt.

135.   DIRTT, Inc. and DIRTT Ltd. have both been injured by Falkbuilt's actions. Plaintiffs both have an interest in the integrity of DIRTT Confidential Information. Both companies also have lost revenue and face the risk of further lost revenue.

## COUNT I - VIOLATION OF UTAH UNIFORM TRADE SECRETS ACT
### (Utah. Code § 13-24-1 *et seq.*)(Against Lance Henderson, Kristy Henderson, Falkbuilt Ltd., Falkbuilt, Inc. and Falk Mountain States, LLC)

136. The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

137. The Utah Uniform Trade Secrets Act ("UTSA") provides a private right of action for misappropriation of trade secrets.

138. A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Utah. Code § 13-24-2.

139. The term "misappropriation" includes "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from

47

or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Utah. Code § 13-24-2.

140.   The   term   "improper   means"   includes   "theft,   bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Utah. Code § 13-24-2.

141.   While a DIRTT employee, Mr. Henderson had access to DIRTT's trade secrets, including confidential customer and account information, such as marketing strategies and techniques, marketing and development plans for client contact information, price lists, specific contract pricing and payment histories. Such information gives DIRTT a commercial competitive advantage and derives economic value from not being generally known to and not readily ascertainable by the public or any person who can obtain economic value from its disclosure or use.

142.   Upon   information   and   belief,   Defendants   have   conspired   to misappropriate a large number of other DIRTT trade secrets. Plaintiffs are aware

of, for example, DIRTT pricing information, design documents, client specific project documents, and other trade secrets that were misappropriated. However, due to the potentially thousands of individual trade secrets at issue (i.e. individual design files, pricing documents, and client project information), DIRTT cannot reasonably identify each trade secret at issue, as the information necessary for such identification is in the possession of Defendants and in the possession of those former DIRTT employees who took part in Defendants' conspiracy.

143.   As a DIRTT employee, Mr. Henderson was aware of the confidential nature of DIRTT's trade secrets and agreed to ensure the continued confidentiality of such information as set forth above.

144.   As a DIRTT employee, Mr. Henderson was also aware that DIRTT placed confidence in him to maintain the confidentiality of DIRTT's trade secrets, at least through the confidentiality agreement he signed.

145.   At all relevant times, DIRTT made, and continues to make, reasonable efforts to maintain the secrecy of DIRTT's trade secrets, by, among other things, requiring Mr. Henderson to sign a confidentiality agreement in connection with his employment.

146.   In violation of his duty to refrain from using or disclosing DIRTT's trade secrets, Mr. Henderson, on his own and as part of a conspiracy with Falkbuilt

53682906;25

Ltd., Falkbuilt, Inc., Kristy Henderson and Falk Mountain States, LLC, misappropriated DIRTT's trade secrets, including but not limited to, confidential and proprietary customer account information, marketing data and analysis, customer histories and payment histories, including marketing information and hundreds of DIRTT files and folders.

147.   These Defendants' violations of the UTSA caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Defendants' misappropriation of DIRTT's trade secrets.

148.   DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT Confidential Business Information and other confidential and proprietary information, and diminishment of business value and competitive standing.

149.   Falkbuilt competes directly with DIRTT, and Defendants continue to use the misappropriated DIRTT trade secrets to gain an unfair competitive advantage in the marketplace. Upon information and belief, it is at least in part due to Falkbuilt's illegal use of DIRTT's trade secrets that several DIRTT projects were stolen by Falkbuilt, and the reason why DIRTT lost bids to Falkbuilt on the

same projects.  A list of such projects currently known to DIRTT is attached as Exhibit P, and filed under seal.

150.   At all times, Mr. Smed, as founder and CEO of Falkbuilt, was aware of and actively encouraged Mr. Henderson's and Kristy Henderson's improper acquisition of DIRTT trade secret information.

151.   In addition to Mr. Henderson, Falkbuilt Ltd., Falkbuilt, Inc., Falk Mountain States, LLC, Kristy Henderson, and Mogens Smed are directly liable for violations of the UTSA because they actively participated, through their conspiracy with each other and Mr. Henderson, in misappropriating DIRTT's trade secrets.

152.   Falkbuilt, Inc., Falkbuilt Ltd., and Falk Mountain States, LLC are also directly liable for violations of the UTSA because they acquired DIRTT trade secret information through their agents, Mr. Henderson and Kristy Henderson, knowing that such information was obtained by improper means, including violations of Mr. Henderson's explicit and implied duties of confidentiality.

153.   Falkbuilt, Inc., Falkbuilt Ltd., Falk Mountain States, LLC, Mr. Henderson, and Kristy Henderson are each liable for violations of the UTSA because they used DIRTT trade secrets (which include DIRTT Confidential Business Information) without express or implied permission from DIRTT and because Falkbuilt, Inc., Falkbuilt Ltd., Falk Mountain States, LLC and Kristy

51

Henderson knew or had reason to know that Mr. Henderson had acquired DIRTT's trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use, and had divulged DIRTT's trade secrets when he owed a duty to DIRTT to maintain their secrecy or limit their use.

154.   DIRTT has been and continues to be injured irreparably by these Defendants' misappropriations of its trade secrets.

## COUNT II – FEDERAL DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836) (Against Lance Henderson, Kristy Henderson, Falkbuilt Ltd., Falkbuilt, Inc., and Falk Mountain States, LLC)

155.   The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

156.   The Federal Defend Trade Secrets Act provides a private right of action for an "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

157.   A "trade secret" means:

> all forms and types of financial, business, scientific, technical, economic or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the

information derives independent economic value, actual or potential, from not being known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1836(3).

158.   The term "misappropriation" includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(III).

159.   The term "improper" includes "breach of a duty to maintain secrecy . . ." 18 U.S.C. §1939(6).

160.   DIRTT Confidential Business Information is a "trade secret" under the Federal Defend Trade Secrets Act because it comprises confidential and proprietary customer information, including marketing plans, strategies and data, artwork, financial information, customer information, account histories and other information which DIRTT takes reasonable measures to maintain secret.

161.   Such information derives independent economic value because it provides DIRTT with a competitive commercial advantage from not being known

to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

162.   Upon information and belief based upon available objective information, Defendants have conspired to misappropriate a large number of other DIRTT trade secrets.   Plaintiffs are aware of, for example, DIRTT pricing information, design documents, client specific project documents, and other trade secrets that were misappropriated.   However, due to the potentially thousands of individual trade secrets at issue (i.e. individual design files, pricing documents, and client project information), DIRTT cannot reasonably identify each trade secret at issue in this Litigation until or unless Defendants respond in discovery, as the information necessary for such identification is in the possession of Defendants and in the possession of those former DIRTT employees who took part in Defendants' conspiracy.

163.   The DIRTT trade secrets misappropriated by Falkbuilt Ltd., Falkbuilt, Inc., Lance Henderson, Kristy Henderson and Falk Mountain States, LLC are used in interstate commerce to bid for, design, and construct projects throughout the United States.

164.   As a DIRTT employee, Mr. Henderson had contractual and fiduciary duties to maintain the secrecy of DIRTT's trade secrets and not misappropriate the information for his own use or for the use of DIRTT's competitors.

165.   At all relevant times, Mr. Henderson was aware of the duty to maintain the secrecy of DIRTT's trade secrets and not misappropriate such information for his own use.

166.   In violation of this duty, Mr. Henderson misappropriated DIRTT's trade secrets, marketing data and analyses, customer histories and payment histories, by taking such information without DIRTT's express or implied consent.

167.   These Defendants' violations of the Federal Defend Trade Secrets Act caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Defendants' misappropriation of DIRTT's trade secrets.

168.   DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT's trade secrets, and diminishment of business value and competitive standing.

169.   Falkbuilt competes directly with DIRTT, and Defendants continue to use the misappropriated DIRTT trade secrets to gain an unfair competitive advantage in the marketplace.  Upon information and belief, it is at least in part due

to Falkbuilt's illegal use of DIRTT's trade secrets that several DIRTT projects were stolen by Falkbuilt, and the reason why DIRTT lost bids to Falkbuilt on the same projects.  A list of such projects currently known to DIRTT is attached as Exhibit P, and filed under seal.

170.   In addition to Mr. Henderson, Falkbuilt, Inc., Falkbuilt Ltd., Falk Mountain States, LLC and Kristy Henderson are directly liable for violations of the Defend Trade Secrets Act because they actively participated, through their conspiracy with other Defendants in misappropriating DIRTT's trade secrets.

171.   Falkbuilt, Inc., Falkbuilt Ltd. and Falk Mountain States, LLC are also directly liable for violations of the Defend Trade Secrets Act because they acquired DIRTT trade secret information through their agents, the Hendersons, knowing that such information was obtained by improper means, including violations of Mr. Henderson's explicit and implied duties of confidentiality.

172.   Falkbuilt, Inc., Falkbuilt Ltd., Falk Mountain States, LLC, Mr. Henderson, and Kristy Henderson are liable for violations of the Defend Trade Secrets Act because they used DIRTT trade secrets without express or implied permission from DIRTT and Falkbuilt, Inc., Falkbuilt Ltd., Falk Mountain States, LLC and Kristy Henderson knew or had reason to know that Mr. Henderson had acquired the DIRTT trade secrets under circumstances giving rise to a duty to

maintain their secrecy or limit their use; and had divulged DIRTT trade secrets when he owed a duty to DIRTT to maintain their secrecy or limit their use.

### COUNT III – BREACHES OF CONTRACTS
### (Against Mr. Henderson)

173.   The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

174.   Mr. Henderson owed contractual duties to DIRTT based on his May 21, 2009 agreement to DIRTT's terms and conditions, and his June 25, 2019 execution of DIRTT's Computer/Data Security policy.

175.   On information and belief, Mr. Henderson breached his obligations under the May 21, 2009 agreement by failing to prevent unauthorized publication and disclosure of (a) any trade secret, manufacturing process or confidential information concerning DIRTT, and (b) the finances of DIRTT and respective dealings, transactions or affairs of which Mr. Henderson was familiar during his employment.

176.   For example, Mr. Henderson has used his knowledge of DIRTT dealings with customers and prospective customers for the benefit of Falkbuilt, Falkbuilt Mountain States, and himself.

177.   On information and belief, Mr. Henderson has also damaged DIRTT by publishing and disclosing to Falkbuilt and Falkbuilt Mountain States, DIRTT's

competitor, DIRTT Confidential Business Information, including confidential electronic information, copied from DIRTT's computer systems before his departure.

178.   On information and belief, Mr. Henderson breached his obligations under the June 25, 2019 DIRTT Computer/Data Security Policy by (a) storing information on systems and channels not controlled by DIRTT (e.g., cloud computing services and a personal hard drive), and (b) accessing DIRTT computer or network locations and resources for which he was not previously authorized (e.g. projects outside of his market area, which on information and belief were accessed to benefit Falkbuilt).

### COUNT IV – VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT (12 P.S. § 5302) (Against Falkbuilt, Inc. and Falkbuilt Ltd.)

179.   The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

180.   The Pennsylvania Uniform Trade Secrets Act ("PUTSA") provides a private right of action for misappropriation of trade secrets.

181.   A "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons

who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 P.S. § 5302.

182.   The term "misappropriation" includes "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." 12 P.S. § 5302.

183.   The   term   "improper   means"   includes   "theft,   bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."   12 P.S. § 5302.

184.  While a DIRTT employee, Ms. Buczynski, working from Pennsylvania, had access to DIRTT's trade secrets, including DIRTT Confidential Business Information, including confidential customer and account information, such as marketing strategies and techniques, marketing and development plans for client contact information, price lists, specific contract pricing and payment histories. Such information derives economic value because it gives DIRTT a commercial competitive advantage from not being generally known to and not readily ascertainable by the public or any person who can obtain economic value from its disclosure or use.

185.  As a DIRTT employee, Ms. Buczynski was aware of the confidential nature of DIRTT's trade secrets and agreed to ensure the continued confidentiality of such information.

186.  As a DIRTT employee, Ms. Buczynski was also aware that DIRTT placed confidence in her to maintain the confidentiality of DIRTT's trade secrets.

187.  At all relevant times, DIRTT made, and continues to make, reasonable efforts to maintain the secrecy of DIRTT Confidential Business Information, by, among other things, requiring Ms. Buczynski to sign a confidentiality agreement.

188.  Upon information and belief, Defendants have conspired to misappropriate a large number of other DIRTT trade secrets. Plaintiffs are aware

60

of, for example, DIRTT pricing information, design documents, client specific project documents, and other trade secrets that were misappropriated. However, due to the potentially thousands of individual trade secrets at issue (i.e. individual design files, pricing documents, and client project information), DIRTT cannot reasonably identify each trade secret at issue, as the information necessary for such identification is in possession of Defendants and in the possession of those former DIRTT employees who took part in Defendants' conspiracy.

189.   In violation of her duty to refrain from using or disclosing DIRTT's trade secrets, Ms. Buczynski, on her own and as part of a conspiracy with Falkbuilt, Inc. and Falkbuilt Ltd., misappropriated DIRTT's trade secrets. Mr. Smed, as CEO and founder of Falkbuilt, was aware of and actively encouraged and induced these activities of Ms. Buczynski, which constitute a breach of her duty to maintain the secrecy of DIRTT's trade secrets.

190.   Falkbuilt, Inc.'s and Falkbuilt Ltd.'s violations of the PUTSA caused DIRTT substantial damage. Among other things, DIRTT was required to hire attorneys and computer forensic experts to investigate and attempt to mitigate Falkbuilt's misappropriation of DIRTT Confidential Business Information.

191.   DIRTT also suffered damage as a result of the loss or diminishment of value of DIRTT Confidential Business Information and other confidential and

proprietary information, and diminishment of business value and competitive standing.

192. Falkbuilt competes directly with DIRTT, and Defendants continue to use the misappropriated DIRTT trade secrets to gain a competitive advantage in the marketplace. Upon information and belief, several DIRTT projects were stolen by Falkbuilt, and DIRTT lost bids to Falkbuilt on the same projects, at least in part due to Falkbuilt's illegal use of DIRTT's trade secrets. A list of such projects currently known to DIRTT is attached as Exhibit P, and filed under seal.

193. DIRTT further believes that Falkbuilt is improperly using DIRTT's confidential information gained from its regional branches to gain a competitive edge on DIRTT in direct competition on projects.  Falkbuilt has used, and continues to use, confidential information obtained from DIRTT to undercut DIRTT's pricing on project bids for which DIRTT and Falkbuilt are in competition.  In many cases, DIRTT has lost bids to Falkbuilt by just hundreds of dollars.  In one example, DIRTT lost the bid for the second phase of a project for which DIRTT had already bid, won, and completed the first phase in 2018 to 2019. DIRTT had informed its Regional Partner of the opportunity to bid on the second phase, which the partner then wrongfully disclosed to Falkbuilt.

194.   Falkbuilt, Inc., and Falkbuilt Ltd. are directly liable for violations of the PUTSA because they actively participated with Ms. Buczynski in misappropriating DIRTT's trade secrets.

195.   Falkbuilt, Inc. and Falkbuilt Ltd. are also directly liable for violations of the PUTSA because they acquired DIRTT trade secret information through their agent, Ms. Buczynski, knowing that such information was obtained by improper means, including violations of Ms. Buczynski's explicit and implied duties of confidentiality.

196.   Falkbuilt, Inc. and Falkbuilt Ltd. are liable for violations of the PUTSA because they used DIRTT trade secrets without express or implied permission from DIRTT, and Falkbuilt, Inc. and Falkbuilt Ltd. knew or had reason to know that Ms. Buczynski had acquired the DIRTT trade secrets under circumstances giving rise to a duty to maintain their secrecy or limit their use; and had divulged DIRTT's trade secrets when she owed a duty to DIRTT to maintain their secrecy or limit their use.

197.   DIRTT has been and continues to be injured irreparably by Falkbuilt, Inc.'s and Falkbuilt Ltd.'s misappropriations of DIRTT's trade secrets.

## COUNT V – VIOLATION OF LANHAM ACT (15 U.S.C. § 1501, et seq.)
### (Against Falkbuilt, Inc., Falkbuilt Ltd. and Mogens Smed)

198.   The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

199.   The Lanham Act provides a private cause of action for misidentification of the origin of goods and services.

200.   Specifically, the Lanham Act provides:

**§1125   FALSE   DESIGNATIONS   OF   ORIGIN,   FALSE DESCRIPTIONS, AND DILUTION FORBIDDEN**

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

53682906;25

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

201. In this case, Falkbuilt has presented itself in the marketplace as providing equivalent services to DIRTT.  As explained above in Paragraphs 45-60, Falkbuilt's solutions are demonstrably not equivalent to those of DIRTT. Falkbuilt's solutions lack the flexibility or customizability of DIRTT's solutions, and rely on considerably older technology.

202. Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed violated the prohibitions of the Lanham Act in four separate ways:

(a)       Repeatedly misrepresenting the nature and character of Falkbuilt's goods and services by drawing false comparisons between DIRTT products and Falkbuilt products, which is likely to cause confusion among consumers, as explained in Paragraphs 45-60 above. Specifically, Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed have misrepresented the capability of Falkbuilt solutions. Similarly, Falkbuilt, Inc.'s, Falkbuilt Ltd.'s and Mr. Smed's false comparisons to DIRTT solutions misrepresent Falkbuilt's access to DIRTT's proprietary methods, which are protected by patents. Falkbuilt further misrepresents the cost of Falkbuilt products over the life of

65

the products. Upon information and belief, such misrepresentations are not limited to individual instances, but are widespread and ongoing. At least one specific example, as explained in Paragraph 56 above, is presently known to DIRTT in which Falkbuilt's misrepresentations as to the equivalency between DIRTT and Falkbuilt were such that when the reality was discovered, project documents had to be formally amended.

(b)     Repeatedly and falsely representing an association or affiliation with DIRTT through the use of social media, which is likely to cause confusion among consumers by, for example, creating an illusion that Mr. Smed and Falkbuilt have access to DIRTT's resources and clientele, and co-opting DIRTT's reputation. This is part of an ongoing effort to persuade consumers that Falkbuilt's products and services are equivalent to DIRTT's products and services. Specifically, Mr. Smed has issued numerous Tweets that either (1) falsely create the illusion of his continued association with DIRTT or (2) detail false information about DIRTT and/or its customers. These Tweets were directed to the marketplace as a whole, and are attached hereto as Exhibit S.

(c)     Ms. Buczynski, on behalf of Falkbuilt, passed off the ready-for-market products in DIRTT's showroom as those of Falkbuilt and,

when discussing Falkbuilt with consumers, referred to it as "the new DIRTT" or "DIRTT 2.0." Upon information and belief, Falkbuilt partners and employees continue to make similar misrepresentations, which are directed at consumers and at the marketplace, generally.

(d)     Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed knowingly misdesignated the origin of Falkbuilt's techsheets and brochures, and similar information included on Falkbuilt's website, mimicking DIRTT's diagrams and products in them even though, as explained in Paragraphs 45-60 above, there is no real equivalence between DIRTT's and Falkbuilt's interior construction solutions. Such information and promotional materials were distributed, and continue to be distributed, widely in the marketplace to consumers.

203.   There is a high likelihood of consumer confusion as to the origin of the goods and services caused by these Defendants' false designations of origin. DIRTT is harmed by the false designation of DIRTT products as those of Falkbuilt because such false attribution diverts existing and potential customers, in the health care sector and others, from DIRTT to Falkbuilt, resulting in damages to DIRTT.

204.   Upon information and belief, it is due to Defendants' false descriptions that several DIRTT projects were obtained by Falkbuilt, either by

flipping projects that were DIRTT projects, or winning bids on projects that would otherwise have gone to DIRTT but for Falkbuilt's misrepresentations.

205.   Pursuant to the Lanham Act, DIRTT is entitled to damages in the amount of: (1) Falkbuilt's profits related to the violations; (2) damages sustained by DIRTT; (3) DIRTT's costs of the action; and (4) DIRTT's attorneys' fees.

## COUNT VI – VIOLATION OF COLORADO CONSUMER PROTECTION ACT (Colo. Rev. Stat. § 6-1-101, et seq.) (Against Falkbuilt, Inc., Falkbuilt Ltd. and Mogens Smed)

206.   The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

207.   The Colorado Consumer Protection Act ("CCPA") provides a private cause of action to citizens of Colorado, including businesses such as DIRTT which are incorporated there.

208.   Defendants Falkbuilt, Inc., Falkbuilt, Ltd. and Mr. Smed are liable for violating the CCPA because these Defendants engaged in unfair or deceptive trade practices by:

(a)      Repeatedly misrepresenting the nature and character of Falkbuilt's  goods and services by drawing false comparisons between DIRTT products and Falkbuilt products, which is likely to cause confusion among consumers, as explained in Paragraphs 45-60 above. Specifically,

68

Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed have misrepresented the capability of Falkbuilt's interior construction solutions. Similarly, Falkbuilt, Inc.'s, Falkbuilt Ltd.'s and Mr. Smed's false comparisons to DIRTT solutions misrepresent Falkbuilt's access to DIRTT's proprietary methods, which are protected by patents. Falkbuilt further misrepresents the cost of Falkbuilt products over the life of the products. Upon information and belief, such misrepresentations are not limited to individual instances, but are widespread and ongoing. At least one specific example, as explained in Paragraph 56 above, is presently known to DIRTT in which Falkbuilt's misrepresentations as to the equivalency between DIRTT and Falkbuilt was such that when the reality was discovered, project documents had to be formally amended. And DIRTT believes that it lost the bid for that project in January 2020 due to Falkbuilt's misrepresentations.

(b)     Repeatedly and falsely representing an association or affiliation with DIRTT through the use of social media, which is likely to cause confusion among consumers by, for example, creating an illusion that Mr. Smed and Falkbuilt have access to DIRTT's resources and clientele, and co-opting DIRTT's reputation. This is part of an ongoing effort to persuade consumers that Falkbuilt's products and services are equivalent to DIRTT's

products and services. Specifically, Mr. Smed has issued numerous Tweets that either: (1) falsely create the illusion of his continued association with DIRTT; or (2) detail false information about DIRTT and/or its customers. These Tweets were directed to the marketplace as a whole, and are attached hereto as Exhibit S.

       (c)    Ms. Buczynski, on behalf of Falkbuilt, passed off the ready-for-market products in DIRTT's showroom as those of Falkbuilt and, when discussing Falkbuilt with consumers, referred to it as "the new DIRTT" or "DIRTT 2.0". Upon information and belief, Falkbuilt branches and employees continue to make similar misrepresentations, which are directed at consumers and at the marketplace, generally.  And in fact, Falkbuilt's own promotional material touts the fact that it has no showrooms, which may explain why Falkbuilt branches and employees rely on DIRTT's showrooms to be able to provide Falkbuilt customers with in-person demonstrations of its solutions.

       (d)    Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed knowingly misdesignated the origin of Falkbuilt's techsheets and brochures, and similar information included on Falkbuilt's website, mimicking DIRTT's diagrams and products in them even though, as explained in Paragraphs 45-60 above,

there is no real equivalence between DIRTT's and Falkbuilt's interior construction solutions. Such information and promotional materials were distributed, and continue to be distributed, widely in the marketplace to consumers.

209.   All of these acts and false statements of facts occurred in the course of Falkbuilt's business, and these Defendants' efforts to create confusion are directed generally to the marketplace for DIRTT's goods and services.

210.   These Defendants' acts and false statements of facts constitute an ongoing fraud on the consumer public.

211.   These acts and false statements of facts significantly impact the public as actual or potential consumers of DIRTT's goods and services because they create a high likelihood of confusion among actual or potential consumers of those goods and services as to the origin of those goods and services.

212.   The end users of DIRTT's goods and services, including hospitals and medical clinics, are not necessarily knowledgeable about the technological nuances of the process by which these units are constructed. Thus, these Defendants' efforts to misstate the origin of these goods and services have the capacity, and are highly likely, to deceive consumers. These consumers are likely to have to expend time and effort to determine the actual origin of the goods and services. Unless

restrained and enjoined by this Court, these Defendants' actions will continue to cause confusion in the marketplace as to the origin of DIRTT's goods and services.

213.   The conduct of these Defendants has caused, and unless restrained and enjoined by this Court, will continue to cause, irreparable damage to DIRTT, a Colorado corporation, by confusing consumers as to the origin of its goods and services and by creating doubt about DIRTT's stability with respect to its partner network. These Defendants' deceptive conduct has directly and negatively impacted DIRTT's reputation, business value, and competitive standing. Upon information and belief, it is due to Defendants' false statements of fact that several DIRTT projects were stolen by Falkbuilt, and the reason why DIRTT lost bids to Falkbuilt on the same projects.  A list of such projects currently known to DIRTT is attached as Exhibit P, and filed under seal.

214.   Pursuant to Colo. Rev. Stat. § 6-1-113, DIRTT is entitled to recover an amount equal to three times its actual damages, and reasonable attorneys' fees.

## COUNT VII – VIOLATION OF OHIO DECEPTIVE PRACTICES ACT
### (Ohio Rev. Code Ann. § 4165.01, et seq.)
### (Against Falkbuilt, Inc., Falkbuilt Ltd. and Mogens Smed)

215.   The allegations contained in the preceding paragraphs set forth above are incorporated as if fully set forth herein.

216.   The Ohio Deceptive Practices Act ("ODPA") provides a private cause of action when, among other things, "in the course of [a] person's business, vocation or occupation, the person causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services."  Ohio Rev. Code Ann. § 4165.02(A)(2).

217.   Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed are liable for violation of the ODPA because they knowingly engaged in deceptive trade practices by falsely designating the source of goods and services originated by DIRTT by:

(a)   Repeatedly misrepresenting the nature and character of the goods and services by drawing false comparisons between DIRTT products and Falkbuilt products, which is likely to cause confusion among consumers, as explained in Paragraphs 45-60 above. Specifically, Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed have misrepresented the capability of Falkbuilt's interior construction solutions. Similarly, Falkbuilt, Inc.'s, Falkbuilt Ltd.'s and Mr. Smed's false comparisons to DIRTT solutions

misrepresent Falkbuilt's access to DIRTT's proprietary methods, which are protected by patents. Falkbuilt further misrepresents the cost of Falkbuilt products over the life of the products. Upon information and belief, such misrepresentations are not limited to individual instances, but are widespread and ongoing. At least one specific example, as explained in Paragraph 56 above, is presently known to DIRTT in which Falkbuilt's misrepresentations as to the equivalency between DIRTT and Falkbuilt was such that when the reality was discovered, project documents had to be formally amended.  And DIRTT believes that it lost the bid for that project in January 2020 due to Falkbuilt's misrepresentations.

       (b)     Repeatedly and falsely representing an association or affiliation with DIRTT through the use of social media, which is likely to cause confusion among consumers by, for example, creating an illusion that Mr. Smed and Falkbuilt have access to DIRTT's resources and clientele, and co-opting DIRTT's reputation. This is part of an ongoing effort to persuade consumers that Falkbuilt's products and services are equivalent to DIRTT's products and services. Specifically, Mr. Smed has issued numerous Tweets that either: (1) falsely create the illusion of his continued association with DIRTT or; (2) detail false information about DIRTT and/or its customers.

These Tweets were directed to the marketplace as a whole, and are attached hereto as Exhibit S.

(c)     Ms. Buczynski, on behalf of Falkbuilt, passed off the ready-for-market products in DIRTT's showroom as those of Falkbuilt and, when discussing Falkbuilt with consumers, referred to it as "the new DIRTT" or "DIRTT 2.0". Upon information and belief, Falkbuilt branches and employees continue to make similar misrepresentations, which are directed at consumers and at the marketplace, generally.  And, in fact, Falkbuilt's own promotional material touts the fact that it has no showrooms, which may explain why Falkbuilt partners and employees rely on DIRTT's showrooms to be able to provide Falkbuilt customers with in-person demonstrations of its solutions.

(d)     Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed knowingly misdesignated the origin of Falkbuilt's techsheets and brochures, and similar information included on Falkbuilt's website, mimicking DIRTT's diagrams and products in them even though, as explained in Paragraphs 45-60 above, there is no real equivalence between DIRTT's and Falkbuilt's interior construction solutions. Such information and promotional materials were

distributed, and continue to be distributed, widely in the marketplace to consumers.

218.   There is a high likelihood of confusion or misunderstanding on the part of the buying public as to the source of DIRTT's goods and services caused by these Defendants' false designations of origin. These Defendants knew that their actions were deceptive. DIRTT is harmed by the false designation of DIRTT products as those of Falkbuilt because such false attribution diverts existing and potential customers, in the health care sector and others, from DIRTT to Falkbuilt, resulting in monetary damages to DIRTT.

219.   These Defendants' intentional efforts to misstate the origin of these goods and services have the capacity, and are highly likely, to deceive consumers. Unless restrained and enjoined by this Court, these Defendants' actions will continue to cause confusion in the marketplace as to the origin of DIRTT's goods and services.

220.   These Defendants' deceptive conduct has directly and negatively impacted DIRTT's reputation, business value, and competitive standing. The extent of this damage is not yet known, but will be proven at trial.

221.   Pursuant to ODPA, DIRTT is entitled to an injunction enjoining Mr. Smed, Falkbuilt, Inc. and Falkbuilt Ltd. from violating the ODPA and creating a

likelihood of confusion among the buying public as to the source of DIRTT's goods and services. DIRTT is further entitled under the ODPA to recover its actual damages and, due to Defendants' willful violations of the statute, DIRTT is also entitled to recover its reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, DIRTT respectfully requests the following relief against Defendants:

a.      Enter judgment for it and against Lance Henderson, Kristy Henderson, Falkbuilt Ltd., Falkbuilt, Inc., and Falk Mountain States, LLC on Counts I and II, against Falkbuilt, Inc. and Falkbuilt Ltd. on Count IV, against Mr. Henderson on Count III, and against Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed on Counts V, VI and VII;

b.      Continue the preliminary injunction currently in place restraining and enjoining each Defendant, including Mr. Smed and Falkbuilt, Inc., and all persons and entities in active concert with any of them, from disclosing, using or misappropriating any of DIRTT's trade secrets;

c.      Enter a mandatory injunction requiring each Defendant, and all persons and entities in active concert with any of them, to return to DIRTT any and all written materials, including copies thereof, and/or flash drives, thumb drives, external hard drives, USB storage drives, computer disks, diskettes, databases and/or other retrievable data which reflect, refer, or relate to DIRTT Confidential Business Information, and any copies that are in Defendants' possession, custody, or control;

d.      Order each Defendant, and all persons and entities in active concert with any of them, to provide a full accounting as to the whereabouts of all of DIRTT's trade secrets, DIRTT Confidential Business Information and other DIRTT property in their possession, custody, or

53682906;25

control (including information on the personal cloud drives of Defendants' employees);

e.      Enter judgment that Lance Henderson, Kristy Henderson, Falkbuilt Ltd., Falkbuilt, Inc., and Falk Mountain States, LLC are jointly and severally liable to DIRTT for its actual damages for losses resulting from these Defendants' misappropriation of DIRTT's trade secrets, including but not limited to lost profits proximately caused by Defendants' misappropriation, or in the alternative, a reasonable royalty for Defendants' misappropriation of DIRTT's trade secrets in violation of the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act;

f.      Enter judgment that Lance Henderson, Kristy Henderson, Falkbuilt Ltd., Falkbuilt, Inc., and Falk Mountain States, LLC are jointly and severally liable to DIRTT for disgorgement of all compensation paid to Mr. Henderson by DIRTT during and after his breaches, and disgorgement of any and all profits Defendants earned as a result of the misappropriation of DIRTT's trade secrets in violation of the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act;

g.      Enter judgment that Lance Henderson, Kristy Henderson, Falkbuilt Ltd., Falkbuilt, Inc., and Falk Mountain States, LLC are jointly and severally liable to DIRTT for exemplary damages for these Defendants' willful, wanton or reckless disregard of DIRTT's rights under the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets Act;

h.      Enter judgment that Lance Henderson, Kristy Henderson, Falkbuilt Ltd., Falkbuilt, Inc., and Falk Mountain States, LLC are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for these Defendants' willful, wanton or reckless disregard of DIRTT's rights under the Utah Uniform Trade Secrets Act and/or Federal Defend Trade Secrets;

i.      Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are liable to DIRTT for its actual damages for losses resulting from their misappropriation of DIRTT's trade secrets, including lost profits proximately caused by Falkbuilt, Inc.'s and Falkbuilt Ltd.'s

78

misappropriation of DIRTT's trade secrets, or, in the alternative, a reasonable royalty for their misappropriation of DIRTT's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act;

j.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are liable to DIRTT for disgorgement of all compensation paid to Ms. Buczynski by DIRTT during and after her breaches, and disgorgement of any and all profits Mr. Smed, Falkbuilt, Inc. and Falkbuilt Ltd. earned as a result of the misappropriation of DIRTT's trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act;

k.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are liable to DIRTT for exemplary damages for their willful, wanton or reckless disregard of DIRTT's rights under the Pennsylvania Uniform Trade Secrets Act;

l.    Enter judgment that Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for their willful, wanton or reckless disregard of DIRTT's rights under the Pennsylvania Uniform Trade Secrets Act;

m.    Enter judgment that Mr. Henderson is liable to DIRTT for its actual damages and losses resulting from Mr. Henderson's breaches of contracts;

n.    Enter judgment that Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed are jointly and severally liable to DIRTT for their violation of the Lanham Act;

o.    Enter judgment that Falkbuilt, Inc., Falkbuilt Ltd. and Mr. Smed are jointly and severally liable to DIRTT for Falkbuilt's profits related to their violation of the Lanham Act; damages sustained by DIRTT; DIRTT's costs of the action; and DIRTT's attorney's fees for their violation of the Lanham Act;

p.    Enter judgment that Mr. Smed, Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for three times the amount of its actual damages for their willful, wanton or reckless disregard of DIRTT's rights under the Colorado Consumer Protection Act;

q.     Enter judgment that Mr. Smed, Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for Defendants' violation of the Colorado Consumer Protection Act;

r.     Enter judgment that Mr. Smed, Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's actual damages for their violation of the Ohio Deceptive Practices Act;

s.     Enter judgment that Mr. Smed, Falkbuilt, Inc. and Falkbuilt Ltd. are jointly and severally liable to DIRTT for DIRTT's attorneys' fees for their willful violation of the Ohio Deceptive Practices Act;

t.     Enter an injunction enjoining Mr. Smed, Falkbuilt, Inc. and Falkbuilt Ltd. from violating the Ohio Deceptive Practices Act and creating a likelihood of confusion among the buying public as to the source of DIRTT's goods and services; and

u.     Award such other and further relief that this Court determines to be just and proper under the circumstances.


Dated: October 20, 2020                    DIRTT ENVIRONMENTAL
                                           SOLUTIONS, INC. and DIRTT
                                           ENVIRONMENTAL SOLUTIONS
                                           LTD.

                                           Plaintiff,


                                           By: /s/ Chad E. Nydegger
                                                 One of Their Attorneys

Chad E. Nydegger
Workman Nydegger
60 East South Temple, Suite 1000
Salt Lake City, Utah 84111
cnydegger@wnlaw.com

Jeffrey J. Mayer
Catherine A. Miller
Akerman LLP
71 S. Wacker Drive, 47th Floor
Chicago, Illinois 60606
Jeffrey.Mayer@akerman.com
Catherine.Miller@akerman.com


*Attorneys for Plaintiff*

53682906;25